James Dean WALKER, Appellant,

v.

O. E. BISHOP, Superintendent of Arkansas State Penitentiary, Appellee.

No. 19049.

United States Court of Appeals
Eighth Circuit.

March 25, 1969.

---

Gene Worsham, Little Rock, Ark., for appellant; Fletcher Jackson, Little Rock, Ark., with him on the briefs.

Don Langston, Asst. Atty. Gen., of Arkansas, Little Rock, Ark., for appellee; Joe Purcell, Atty. Gen., Little Rock, Ark., with him on the brief.

Before MEHAFFY, GIBSON and HEANEY, Circuit Judges.

MEHAFFY, Circuit Judge.

This appeal is from a judgment dismissing appellant Walker's petition for a writ of habeas corpus following a plenary evidentiary hearing before The Honorable J. Smith Henley, Chief Judge of the United States District Court for the Eastern District of Arkansas. Walker has been twice found guilty of murder in the first degree for the killing of a North Little Rock police officer. In the first trial, Walker was sentenced to death, but the Supreme Court of Arkansas remanded the case for a new trial, Walker v. State, 239 Ark. 172, 388 S.W. 2d 13 (1965). Upon retrial, Walker was sentenced to life imprisonment which conviction was affirmed by the Arkansas Supreme Court in Walker v. State, 241 Ark. 300, 408 S.W.2d 905 (1966). Following the affirmance by the Arkansas court in the second conviction, Walker attempted an appeal to the Supreme Court. His appeal was treated as a petition for a writ of certiorari and was denied, 386 U.S. 682, 87 S.Ct. 1324, 18 L. Ed.2d 403 (1967). The Supreme Court also denied Walker's petition for rehearing and motion to present argument in support thereof, 387 U.S. 926, 87 S.Ct. 2027, 18 L.Ed.2d 987 (1967). Chief Judge Henley's opinion denying the habeas writ in the instant case is published in D.C., 295 F.Supp. 767.

Upon appeal before us, Walker challenges the second conviction as being violative of his constitutional due process rights, asserting that the state trial judge was biased and made prejudicial comments as to the previous conviction; that the state suppressed and failed to disclose evidence which constituted a denial of due process as did the court's refusal to grant Walker a change of venue; that Ark.Stat. 43–2010 is invalid and contravenes the constitutional prohibition against compulsory self-incrimination; that the court erred at one stage of the proceeding in refusing to allow a thirty-minute recess in order for the defense to

procure the attendance of witnesses who were under subpoena; and finally that Walker was denied the right of confrontation by two witnesses and the opportunity to cross-examine them.

Walker's present attorneys, who entered the case upon appeal following the first conviction, reargue with vigor the issues decided adversely to Walker, both by the Arkansas Supreme Court in the second case and the federal district court in this habeas proceeding. The seriousness of the charges warrants our closest scrutiny and discussion despite our agreement with the conclusions reached by the other courts on the same issues. We affirm the judgment of the federal district court dismissing the petition for writ of habeas corpus.

As a necessary prelude to our discussion, we recite the salient facts. On the evening of April 15, 1963, defendant Walker and a companion, Russell Freeman Kumpe, were in the company of Mary Louise Roberts and Linda Ford, two admitted prostitutes. This party, after frequenting other night spots, was at the South Main Business Men's Club when Walker and Kumpe became involved in an altercation resulting in one of them shooting and injuring a bystander. This happened about midnight and Walker and Kumpe fled the scene as did the two prostitutes. The men went to their motel for the purpose of checking out and skipping town and Kumpe telephoned Linda Ford to meet them at their motel. Ford and Roberts took a cab to the motel, and Ford was forced to accompany the men in their white Oldsmobile, being directed to show them the quickest route away from the city. Roberts wanted to go along but the men refused to take her and ordered her back into her cab. The cab driver, upon inquiry of her, verified that the men were involved in the shooting scrape at the club whereupon he notified his dispatcher who instructed him to follow the Oldsmobile until the police could pick it up. The two men with Kumpe driving, Linda Ford in the middle and Walker on the right side, proceeded across the bridge to North Little Rock.

Alderman, the cab driver, and his passenger, Roberts, followed. Alderman was unable to keep pace with the Oldsmobile but another cab driven by Thomas Short took up the pursuit with the Alderman cab continuing to follow.

In the interim, the North Little Rock police had been alerted and Officers Barrentine and Vaughan were ordered to give pursuit which they did in separate cars. Officer Barrentine soon had the Oldsmobile in view but, knowing the men were armed, did not attempt to stop the Oldsmobile until additional police help arrived. He was in communication by radio with Officer Vaughan and when he saw Vaughan signal him by activating his police light, Barrentine proceeded to stop the Oldsmobile. By this time, the Oldsmobile was a few miles beyond the city limits of North Little Rock on a narrow highway usually called the England Highway. Upon halting the Oldsmobile, it was brought to a stop on the right side of the highway with a part of the car on the shoulder. Barrentine parked his car behind the Oldsmobile and Vaughan, who arrived immediately, parked his police car more in the center of the road. Thereafter, the first cab driven by Short arrived at the scene and sometime later the cab driven by Alderman with Roberts as a passenger arrived, parking on the left or opposite side of the highway. Immediately upon Officer Vaughan's arrival, Officer Barrentine stepped to the front of his police car on the driver's side and ordered Kumpe to get out of the car and come back to his police car which was parked a few feet behind the Oldsmobile, and then proceeded to search him. Officer Vaughan went between the rear of the Oldsmobile and the front of Officer Barrentine's car to the right side of the Oldsmobile and was seen talking to defendant Walker. Nearly instantly, the front door of the Oldsmobile opened and a shot was fired during which time Officer Vaughan was backing away from the front door, with his gun drawn. Immediately, there was a fusillade of shots and Kumpe, who was being searched at the time, broke and ran into the ditch and

weeds by the side of the highway, whereupon Officer Barrentine fired at him two or three times, wheeled and fired four shots into the rear window of the Oldsmobile. Barrentine then radioed for help which soon arrived. Officer Vaughan was found lying near the front door of the Oldsmobile, having been fatally wounded by a shot that penetrated his chest. Walker was also lying outside the door of the Oldsmobile. He had been struck five times and was seriously injured.

Walker was lying outside the Oldsmobile next to Officer Vaughan holding a fully loaded snub-nosed pistol in his hand. Underneath him or right beside him was found a second gun, a .38 caliber Smith & Wesson, which was definitely identified by ballistic experts as being the gun from which the bullet was fired causing Officer Vaughan's death within a short time and before he could make a statement.

Linda Ford, who was seated next to Walker, testified that Walker fired the first shot and there is no question but that Vaughan was killed by a shot from the pistol found under or by Walker's side. When he was approached, one of the officers kicked the gun he was holding out of his hand and the location of the gun seems to have caused some confusion, but, as stated, there is no question but that Vaughan was killed by a shot from the .38 caliber Smith & Wesson.

In the first trial, Walker interposed a defense of insanity and did not take the witness stand. Upon the second trial, however, his present attorneys, having entered the case after the first conviction but prior to the appeal, upon the case's being remanded depended upon the theory that one of Officer Barrentine's shots had ricochetted from the bumper of the Oldsmobile, thus causing Vaughan's death, and in effect theoretically corroborating Walker's statement in the second trial that he fired no shot.

### The Trial Court's Asserted Bias and Prejudicial Statements.

Just before commencement of the second trial, Walker's attorneys made an oral motion to disqualify the judge for his bias and prejudice. This motion was grounded on asserted statements made by the judge in chambers some months before when a minister and two companions sought the judge's permission to permit Walker to be taken to church for the purpose of his baptism. The judge granted this request but admonished the deputy sheriff to see that Walker was heavily guarded and to shoot him if he attempted to escape. The minister and his companions testified that the judge made that statement and also said that he intended to "burn the s.o.b." or "burn him anyway." In overruling the motion, the judge stated:

"I think I can give him a fair trial, but I have nothing to do with punishing him, certainly. It is up to the jury to do that. If I don't give him a fair trial, the Supreme Court can reverse me. They have reversed me once before when I thought I was right. I don't think my personal feelings have anything to do with it one way or the other. I did make the statement that if he ran to shoot him. I remember that. I don't remember saying that I was going to burn him, because that's silly; I can't burn him."

■ At the time above described, Walker had been transferred from the state penitentiary to the county jail for the convenience of his counsel, who, as the Arkansas Supreme Court noted, were given seven months for preparation for trial. The judge said he did not recall making the statement about "burning" the defendant as to have done so would have been silly because, under Arkansas law, the judge has nothing whatsoever to do with the assessment of punishment in a case of this kind. Certainly Judge Kirby, who has presided over the criminal division of the circuit court for many years, knew, as does every other lawyer in Arkansas, that the presiding

judge has no function in the assessment of punishment in such a case, this being the sole province of the jury. The alleged statement made some months before the trial, if made, could at the very most be construed to indicate the judge's feeling that the defendant was guilty and any such innermost thoughts on the part of the judge constituted no cause for his disqualification. The judge said that he could give defendant a fair trial. The Supreme Court of Arkansas held that there was no showing of bias or prejudice and the defendant was accorded a fair trial. Chief Judge Henley, the United States district judge, made the same finding in the habeas proceeding, and our canvass of the entire record of the second trial in addition to the voluminous habeas record compels the same conclusion on our part.

When trial judges are confronted with a situation like this, there is as much obligation on the part of the judge not to recuse himself when there is no occasion for so doing as there is to recuse himself when such an occasion exists. United States v. Hoffa, 382 F.2d 856, 861 (6th Cir. 1967), cert. denied, 390 U.S. 924, 88 S.Ct. 854, 19 L.Ed.2d 984 (1967); In re Union Leader Corp., 292 F.2d 381, 391 (1st Cir. 1961), cert. denied, 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed. 190 (1961); Tucker v. Kerner, 186 F.2d 79, 85 (7th Cir. 1950).

Additional to the motion, defendant has argued with vigor that a numerosity of instances and utterances occurring at the trial itself constituted the basis of reflection of bias of the trial judge. These matters were presented in narrative form to the United States district court and in the main constituted instances and expressions outside the presence of the jury. Some of the charges made had reference to the first trial with which we are not concerned here. The Supreme Court of Arkansas, which we highly respect, concluded that the trial court acted properly and even generously towards Walker in the course of the second trial, and that the judge exhibited no personal bias or prejudice to the jury. That court, among other things, noted that defendant was given seven months to prepare for the second trial, that his motion to be placed in the county jail during that time for the convenience of his counsel was granted as was what the Arkansas court characterized as defendant's "sweeping motion for production and private examination of all the tangible objects which were to be introduced by the State in evidence." That court, after canvassing the entire record, as do we, stated:

> "We find from the record in this case that the trial court conducted the trial in an exemplary manner and without any bias or prejudice toward the accused."

The State Attorney General responded in brief to the attack made on the judge by pointing out that defendant had taken the remarks of the court out of context and even offered colloquy between the trial judge and the defense counsel which would indicate their good and friendly relationship in the course of the trial. We agree with the State's analysis of the extracts from the proceedings, as, of course, the only way to ascertain the true meaning or import of any isolated remark is to consider it in the light and context in which it is uttered. This is just plain common sense as well as good law. Foster v. Medina, 170 F.2d 632, 633 (2nd Cir. 1948), cert. denied, 335 U.S. 909, 69 S.Ct. 412, 93 L.Ed. 442 (1948). Our analysis of the entire record leads us to the conclusion that at the very worst the court might have shown some irritation at defense counsel's trial tactics, in particular counsel's insistence upon repeating interrogation despite the court's previous ruling on admissibility. This, of course, is not indicative of any personal bias or prejudice on the part of the court and does not constitute reversible error whether the court's irritation was justified or not. Rosen v. Sugarman, 357 F.2d 794, 798 (2nd Cir. 1966).

*The Trial Judge's Comments to the Jury that the Trial Constituted a Retrial of the Conviction that Had Been Reversed by the Supreme Court.*

█ Defendant next contends that he was deprived of a fair and impartial trial by the following comments of the trial judge made immediately prior to the *voir dire* examination of the individual jurors:

"By way of explanation, I might say to the jury that this is the second time this case has been tried, or will be the second time. Mr. Walker was tried once and convicted and the Supreme Court reversed it and sent it back here for retrial, and this is the retrial, ladies and gentlemen."

In holding there was no merit to defendant's contention, Chief Judge Henley observed in his opinion in the habeas proceeding that the judge's remarks here appeared to have been "necessary if an impartial jury was to be chosen," and characterized defendant's contention as being constitutionally insubstantial. The Arkansas Supreme Court dealt elaborately with this assignment and noted that defendant was in no position to complain as his counsel had extensively cross-examined the prosecution witnesses upon their testimony at the first trial in an effort to impeach them and that counsel's conduct of the trial throughout kept before the jury the fact of the other trial. The court further observed that the remarks of the court could well be construed as favorable to the defendant. Additionally, the Arkansas court cited its own decisions on this question as not constituting error. Ford v. State, 222 Ark. 16, 257 S.W.2d 30 (1953), and Stanley v. State, 174 Ark. 743, 297 S.W. 826 (1927).

There is nothing in the trial court's remarks to indicate any opinion of guilt or that in any wise could be said to be prejudicial to the defendant or that could possibly have influenced the jury from exercising an impartial judgment. There was no way this case could have been tried without the jury's learning during the progress of the trial that it was in fact a retrial. Under these circumstances, it seems to us to have been the better practice to do precisely what the trial judge did here, and that is in simple language to explain to the jury at the outset that this was a retrial and thus eliminate any possibility of confusion on the part of the jury during the progress of the trial. We have examined the cases cited by defendant which involve proof of conviction of prior crimes and they are obviously inapposite. In our view, the remarks were proper and enlightening and incapable of being construed to constitute prejudice to defendant or to impair his right to a fair trial.

*Asserted Suppression of Evidence and False and Deceptive Evidence.*

We think defendant paints with too broad a brush when he charges the State with suppressing vital evidence favorable to the accused and with using false testimony to procure the present conviction. Some of the charges are specious and, as will be seen, all are completely without merit.

Intertwined in the argument are references to the first trial with which we are not concerned. Insofar as the second trial is concerned, the State offered defendant, on more than one occasion, any and all evidence from the State's file which defense counsel desired, and prior to trial the court granted the defense motion in what the Supreme Court of Arkansas characterized as a "sweeping order," requiring the State to submit to defendant's attorneys each and all of its tangible objects which were to be used in evidence for copying and photographing, including ballistics reports on the guns of Officers Vaughan and Barrentine and also on the gun alleged to have belonged to defendant, fingerprint reports, if any, of defendant, the autopsy report, the coroner's report, paraffin test reports, and all photographs of police vehicles at the scene, and further requiring all guns involved in gunfire to be turned over to defendant's counsel for private and independent examination, as well as the bul-

lets recovered from the body of defendant and the empty shells of the gun alleged to have belonged to defendant. Thus, prior to trial, the court granted defendant all of the relief sought in his motion and, as heretofore stated, on motion of defendant made the same day, defendant was ordered to be delivered to the Pulaski County Jail from the penitentiary for the convenience of his counsel in conferring with him in preparation for trial. Thereafter, when defense counsel repeatedly accused the State of suppressing evidence in his *voir dire* examination of the individual jurors, the prosecutor, on several occasions, offered to furnish counsel anything he wanted from the State's file, and all counsel had to do was simply indicate what was desired. During the *voir dire* examination, Mr. Jernigan, the prosecutor, directed the following question to defendant's counsel:

"MR. JERNIGAN: On the questions on voir dire, you talked about the State withholding and concealing evidence, and I would like to know at this time if you have any reference to anything that you have not been furnished. In other words, anything that was supposed to be furnished, as far as I know, has been furnished you, as the Court ordered. I want you to have it all, and you have it all as far as I know. But, if there is anything that you think that I might fail to bring in, which you have any knowledge of, I would like for you to tell me now, because I will sure bring it in. In other words, what is the evidence that we are supposed to be concealing, or that we are going to conceal and not give? If you have that, I want to know it."

Defendant's counsel replied in effect that he should not be "required now to further divulge any defenses" he had.[1]

What we conceive to be the principal complaint in connection with the charge of suppression of evidence is the State's inability to locate and serve subpoenas upon two witnesses who testified at the first trial, namely, Mary Louise Roberts and Linda Ford. The inability of the State to locate these witnesses permitted the State to read their testimony taken at the first trial. The uncontradicted evidence is that the State used every available means to locate these witnesses without success. The subpoenas were issued on October 23, but Dennis L. Jones, a process server with the county sheriff's office, had been instructed by the prosecutor prior to the issuance of the subpoenas to make a search for the witnesses. In doing this, he contacted the police department and obtained the license number of the automobile Mary Louise Roberts had been driving and made repeated trips, both at night and during the day, to places the girls were known to frequent without finding either of them. Ford had been located for the first trial at Lake Village, Arkansas and Mr. Jones called the chief of police there who advised that she had not been seen by him in Lake Village for several months, but the chief of police offered to cooperate and forward any information he could obtain as some of Ford's relatives lived in Lake Village. The day following the issuance of the subpoenas, the Lake Village chief of police called and advised that Ford was supposed to have been married and living at 1800 Scott Street in Little Rock. She was not at that address, however, but Jones was informed

---

1. The prosecutor during the course of the trial made repeated statements similar to these:
 "If he wants to keep it going for two weeks, we will, because I don't want to be in the position that we are withholding anything." "We certainly are not withholding anything, and have no intention to withhold anything. * * *"
 With respect to the admissibility of certain testimony without foundation (the bullets recovered from defendant's body), the record shows the following statements by the court and the prosecutor:
 "THE COURT: All right, the State has no objection, and it is satisfactory with the Court.
 "MR. JERNIGAN: I want them to have everything they want. * * * I am not going to object. I want everything."

by someone there that she had, in fact, lived there, and that her husband was either in California or Florida, but this person did not then know where the girl was. Jones also checked the address he had of the witness' mother only to find that she no longer lived at the address. Jones checked the city directory and the criss-cross directory and looked for the witnesses every place he had been able to get leads, and in his words, "I have exhausted every possible means that I have had, according to the knowledge I have been able to determine, about where she might be." When the North Little Rock police chief was notified that these witnesses were wanted, he ordered a general pickup for them on November 3. He put this pickup notice on the bulletin board and also in the hands of the supervisor of employees. Police Chief Brians of the Little Rock Police Department was also notified and a month or six weeks before trial he instructed the commanding officers of the vice detail and detective division to advise the personnel under their respective commands to be on the lookout for these witnesses. The bulletins and information given the police officers of both cities also contained the home telephone number of the process server so that he could be reached at any time of day or night. Thus, the State utilized, in addition to the normal services of the process server, the police departments of two cities in an intensive effort to locate the two girls. Every lead was followed and the girls were well known, at least to the vice squad officers. This effort extended for weeks before the trial and we do not know what more could possibly have been done to serve the subpoenas.

When this proof was adduced, the trial court held, as it was bound to do under the evidence, that the State had made a diligent effort to obtain the production of the witnesses, and since they were not available their testimony given at the former trial was admissible in evidence. It was at this juncture that the court observed he would much prefer to have the girls present to testify. Defense counsel asserted that he had information that the witnesses were in the community and had been frequenting night spots and could be available, and that he had witnesses under subpoena to make such proof, but strangely enough he did not at any stage of the trial produce these witnesses or offer any other testimony that the girls were within the jurisdiction. He complained bitterly that if given a fifteen-minute delay he could have the witnesses there, but obviously if such witnesses existed and were willing to give such testimony and if defense counsel really wanted them and could have produced them, he would have done so at some stage of the trial. The trial did not move that swiftly, and the defense had had ample time to produce them if counsel knew of their whereabouts, after the State had given notice that it was unable to locate them. Counsel was hypertechnical throughout the trial and must have known that if such proof could be made, even after the testimony in the former trial had been read, defendant would be in a far better position to move for a mistrial or, upon rejection thereof, would benefit by creating prejudicial error. Nonetheless, the witnesses were never produced or any contradictory evidence offered as to Roberts' and Ford's availability.

The testimony at the former trial was properly read as the witnesses' testimony was taken in the presence of defendant and his counsel had the full opportunity to and did cross-examine them at length.[2]

2. Ark.Stats.Ann. § 28–713 (Repl.1962) provides:
"28–713. Admissibility of testimony at prior trial.—On the trial of any cause, civil or criminal, the properly authenticated transcript of the testimony of any witness, or other evidence of the testimony of any witness when properly proved, which testimony was given in any court at any former trial or examination of the same cause between the same parties or their privies, may be read or admitted in evidence, when the former witness is dead, beyond the jurisdiction of the court, has become insane since the former trial or examina-

In their brief, counsel refers to the testimony of these witnesses as "their prior false and deceptive testimony was read to the jury, from an unauthenticated transcript and used to obtain the present conviction. The State used again this same tainted evidence at the second trial." If indeed the testimony was from an unauthenticated transcript, it was of defendant's counsel's doing, because when this matter arose defense counsel had the transcript in his possession. The court inquired as to who was going to read the testimony and suggested that defense counsel read it, but defense counsel demurred saying, "I will follow it as he reads it. There are certain objections we will have to make as we go through it." The court then told the attorneys to proceed. The transcript testimony as read is precisely the testimony given at the first trial.

Between the second trial and during the pendency of the appeal to the Arkansas Supreme Court, defendant obtained a thirty-five page question and answer statement from Mary Louise Roberts taken on July 11, 1966 in counsel's law office. The Supreme Court's unanimous opinion in affirmance of the conviction was handed down October 31, 1966, and only after that did counsel reveal the existence of this statement and asserted some claim under Arkansas Criminal Procedure Rule No. 1 on the ground of "newly discovered evidence." Mr. Justice McFaddin in his dissenting opinion related to the Arkansas post-conviction rule in Walker v. State, *supra*, 408 S.W. 2d 905, 920, said:

"The appellant had all this information on July 11, 1966, but never mentioned it to this Court until after our decision on October 31, 1966. He thus kept his 'ace in the hole' until after we had affirmed the conviction and then belatedly attempts to assert some claimed right under Criminal Procedure Rule No. 1. He says that it was 'newly discovered evidence.' As previously shown, he exercised no diligence to get this evidence and should not now prevail in this belated effort, after he had chanced the result of his appeal without telling the Court of what he had."

Defendant produced Mary Louise Roberts at the habeas hearing and also witness Paul Alderman, whose testimony will be hereafter discussed.

■ In the first trial, Mary Louise Roberts testified that she arrived in Alderman's cab, the fifth car in the cavalcade, and stopped on the highway where the murder was committed. She then testified that immediately upon arrival there, the guns were fired and she promptly got down on the floor in the back seat of the cab. At the habeas proceeding defendant undertook to show that this witness was intimidated into avoiding service by the police officers. Admittedly, the local police officers had told her (as they tell all of her profession) that they would arrest her every time they found her plying her trade locally. This was the policy of the local police department, and it can well be assumed it is the policy in other places. The alleged intimidation which would justify avoidance of service in the *Walker* case, however, was contradicted by a number of witnesses and Chief Judge Henley, of course, did not credit witness Roberts' recanted testimony. Her testimony that

tion, or when for any reason the former witness may not be available, and also in all cases in which for any reason a former witness refuses to testify concerning the matters as to which he formerly testified. But no such transcript of testimony, nor proof of such testimony, may be admitted on behalf of either party in a criminal case unless it is first shown that the party against whom it is sought to be used was present, in person or by attorney, at the former trial or examination and there had the opportunity to examine or cross-examine the witness whose testimony or the transcript of whose testimony is offered in evidence."

See: Ark. State Highway Commission v. Wilmans, 239 Ark. 281, 388 S.W.2d 916 (1965); Mode v. State, 234 Ark. 46, 350 S.W.2d 675 (1961), cert. denied, 370 U.S. 909 (1962); Smith v. State, 222 Ark. 585, 261 S.W.2d 788 (1953).

she was thus intimidated was disputed by every police officer she mentioned except one who was not available at the time of the hearing. Of course, the issue here of her credibility was for Chief Judge Henley.

▆ As for Alderman, the witness who was the driver of the cab occupied by Mary Louise Roberts, he claimed to have given a statement after the occurrence but he did not recall to whom he had given the statement or whether it was written or oral. He also testified that some time before the trial he had called some office in Little Rock (he did not know which one) and asked if he was wanted for the trial. His memory was so hazy on things Chief Judge Henley thought he should have remembered that his testimony was also discredited. Of course, accreditation of a witness is for the trial judge who has the opportunity of observing a witness' behavior and demeanor on the witness stand, which places the trial judge in a superior position over that of a reviewing court in this regard, but even a reading of this witness' testimony in the cold record reflects its incredibility. In the first place, his was the last of the five cars to arrive at the scene. The Walker car was the lead car and pulled slightly off the highway on the righthand side. Officer Barrentine's car was immediately behind the Walker car. It was Barrentine who stopped the Walker car. Officer Vaughan's car arrived immediately and he pulled towards the center of the narrow highway. The next car to arrive was the cab which had passed Alderman's cab. It was only after this that Alderman's cab arrived, and it was parked angling towards the left side of the highway. It was somewhere near 2:00 o'clock in the morning, and dark. It seems impossible from a physical standpoint for Alderman to have seen anything that transpired in connection with the shooting after he arrived because the murder was committed at the front door of the lead car where Walker was seated, as Officer Vaughan approached the Walker car. The first witness who testi-

fied identified Alderman, and defense counsel did not at that time request a copy of his statement. If, indeed, a statement had been taken it would have been a part of the prosecutor's file and available. It appears that there was no such statement in the State's file at the time of the habeas hearing. By that time the file had been shuttled between the prosecuting attorney's office and the attorney general's office (which is routine under Arkansas procedure as the attorney general briefs the criminal cases on appeal to the Supreme Court), and there is no evidence that such a statement was ever taken or, if taken, that it was reduced to writing.

▆ It is charged here that the State knew of this witness' potentially dangerous testimony and wrongfully failed to disclose its knowledge to the defense. The district court, after hearing the testimony of the witnesses, properly found that the State was not guilty of any suppression or nondisclosure as far as Alderman was concerned. Indeed, if, after a seven-month investigation, defense counsel only learned this witness' name at the trial, he still had ample time to get out a subpoena and undertake to locate him if the defense was so intent on having him testify, and counsel could have moved for a continuance or mistrial if the witness could not be found within the jurisdiction.

▆ Defendant asserted in his post-hearing brief in the habeas proceeding that Officer Barrentine admitted that he testified falsely in the state court trial. Barrentine made no such admission and the federal district court so held, stating in its opinion, "the court does not construe Officer Barrentine's testimony as any admission that his previous testimony was false in the respect just mentioned or in any other respect." It is true that this witness' testimony was not word for word the same at both the trial and the hearing due to the length of time intervening, but the import of his testimony was the same. One would necessarily need to be wary if, under the circumstances, the testimony

were verbatim. This assignment is completely without merit.

Defendant makes reference in brief to his motion to quash the jury panel on the ground that Jack Oliver, one of the jury commissioners, was a client of the prosecuting attorney. Oliver, an automobile dealer, testified on the motion that he had utilized the services of one Frances Holtzendorff as his regular attorney for some twelve or fifteen years; that the prosecutor was a friend of his and they attended the same church, and on rare occasions when his attorney was unavailable he sought advice from the prosecutor; that only on one occasion had the prosecutor ever represented him in court; that the nature of his business frequently involved him in bankruptcy proceedings. It appears that it was on one of these occasions that he sought the services of the prosecutor. Oliver further testified that the prosecutor never mentioned the petit jury to him, and defendant fails to point out how the relationship of the two could affect defendant's trial. He makes no complaint as to the makeup of the jury, and under the facts it appears that defendant is reaching far afield by even injecting this issue and characterizing it as "false and deceptive" testimony, particularly when the only testimony on the subject in the trial court was taken outside the hearing of the jury.

### The Motion for Change of Venue.

It is next contended that the court erred in denying defendant's motion for a change of venue. This assignment of error is based on newspaper articles concerning the crime. These articles with one exception appeared some fourteen months before the second trial. The only more current newspaper story was an editorial appearing on May 12, 1965, which, of course, was several months before the second trial with which we are concerned. Countering this, the State offered 157 affidavits to the effect that the affiants believed Walker could receive a fair trial in Pulaski County. The editorial mentioned would not in itself have justified a change in venue even if current as there is nothing inflammatory therein. Primarily, it deplores the parole system in Arkansas, really equating a life sentence statistically to a sentence of seven or eight years in the penitentiary.[3]

3. The editorial mentioned is in the following language:
"Death or 8 Years
"James Dean Walker now has a new lawyer and is awaiting a new trial.
"The trial was ordered by the state Supreme Court because of a procedural error in its predecessor—in which the jury convicted Walker of first-degree murder in the killing of a North Little Rock policeman and sentenced him to die in the electric chair. The North Little Rock Times reports that Walker's defense this time around is being financed by a group of Christian laymen opposed to the death penalty.
"The Gazette is inclined to oppose the death penalty, too, but last week wasn't an especially good time to think about tearing out the electric chair.
"The day after Walker turned up in court to plead not guilty for the second time, the state Parole Board paroled Walter Baxter of DeWitt. On August 28, 1954, while he was full of booze, Baxter fired a shotgun through the screen door of a rooming house and killed Burt O. Burbank, a DeWitt city marshal who was entering the rooming house to investigate the disturbance Baxter was creating there. Baxter was convicted and sentenced to die but he won a new trial on a procedural error and, upon being reconvicted in 1957, was sentenced to life imprisonment. A life term, for Baxter, has proved to be less than eight years. Governor Faubus commuted his sentence and this made parole possible.
"We do not hold with punishment for its own sake and we have no notion as to the extent of Mr. Baxter's rehabilitation. We do think killing a policeman an especially repugnant crime for which especially harsh penalties are in order. An attack on an officer of the law is an attack on the law itself, and is therefore an attack on the whole fabric of social order.
"The point which seems to us worth making is that the way the Arkansas remission and probation system now is operated it is impossible to put away any sort of a felon—cop killers and

It is well settled that the trial court has broad discretion in determining whether or not a defendant should be granted a change of venue. In the instant case, all publications were far too remote in time to justify a change of venue and the editorial, even if susceptible to being construed as inflammatory or prejudicial, could not have influenced the jury as its verdict carried with it a life sentence rather than execution.

### The Arkansas Statute.

It is also contended that Ark.Stat. 43–2010 is unconstitutional and violates the prohibition against compulsory self-incrimination.[4] This statute provides that upon the motion of either party the court may order the production of any written document or any other thing which may be necessary or proper to be produced or exhibited as evidence at trial. Defendant has reference here to the ballistics report that he requested, and upon his motion the court ordered everything defendant wanted turned over to him for study by an independent ballistics expert. Defendant's counsel drew the order and in making his motion and request stated: "If the court directs me to give it [Stanton O. Berg's ballistics report] to you [Mr. Jernigan, the prosecutor], then I will as soon as I receive the report."

When this arose at trial, the court said that the statement was not a part of the record at all because the maker had not testified but that both sides had agreed that it could be filed, which was done. The report consists of a written response to certain questions posed to defendant's ballistics expert by his counsel. The defendant's ballistics expert did not testify and his report was not introduced into evidence. The thrust of defendant's argument is that the statements in the report violated his constitutional privilege against self-incrimination. Since the statements contained nothing as coming from defendant and the report was not introduced in evidence, defendant's Fifth Amendment right against self-incrimination is not involved.

It must be borne in mind that we are not an appellate arm of the state court, but that the function and duty of this court is to inquire into whether the defendant's constitutional rights were safeguarded at the trial. As stated by Mr. Justice Douglas in Burgett v. Texas, 389 U.S. 109, 113–114, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967):

> "We do not sit as a court of criminal appeals to review state cases. The States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution."

It is obvious that defendant here was ably represented by experienced and highly competent counsel. His attorneys had the benefit of the transcript of the

---

mutilators of little children included—with any assurance that confinement will last longer than eight years. No matter how heinous the offense, there is an excellent chance that the governor will reduce the sentence and that the Parole Board the governor appoints will then release the offender.

"This is, it seems to us, an almost insuperable barrier to abolition of the death penalty, or even to sensible consideration of abolition of the death penalty. It is, surely, one reason Arkansas juries do not incline to avoid the death penalty. They know that they must choose between putting a criminal out of circulation permanently—by taking his life—and putting him out of circulation

for eight years or so, by decreeing a life sentence. One needn't favor taking of a life for a life to incline toward the death penalty for especially dangerous criminals under those ground rules."

4. Ark.Stats.Ann. § 43–2010 (Repl.1964) provides:

"43–2010. Production of documents.— The court, on motion of either party, may, by its order and process, compel the production of any written document, or any other thing which may be necessary or proper to be produced or exhibited as evidence on trial, and may punish a disobedience of its orders or process as in case of witnesses refusing to testify."

testimony in the first trial and some seven months for their intensive preparation. From the former record, they structured a new defense which the jury just simply did not believe. We commend counsel for their zeal in their client's behalf as it can be fairly said that they fought vigorously every inch of the way. Our canvass of the entire trial record, as well as the record of the habeas corpus proceeding, however, clearly convinces us beyond question that defendant was afforded a fair trial and that none of his constitutional rights was denied.

The judgment denying defendant's petition for writ of habeas corpus is affirmed.