James Dean WALKER, Petitioner,

v.

**A.L. LOCKHART, Director, Arkansas
Department of Correction,
Respondent.**

No. LR–C–81–280.

United States District Court,
E.D. Arkansas, W.D.

Dec. 6, 1984.

Oscar Fendler, Blytheville, Ark., Bill
Bristow, Jonesboro, Ark., L. Gene Wors-
ham, Chip Baker, Little Rock, Ark., Paul N.
Halvonik, Berkley, Cal., for petitioner.

Steve Clark, Atty. Gen., State of Ark., Theodore G. Holder, A. Carter Hardage, Asst. Attys. Gen., Little Rock, Ark., for respondent.

## MEMORANDUM OPINION

HENRY WOODS, District Judge.

### I. HISTORY OF LITIGATION

James Dean Walker was charged with murdering a young North Little Rock Police officer on April 16, 1963. At his trial a year later, Walker pled not guilty and not guilty by reason of insanity. As Judge Henley aptly observed in a later habeas corpus opinion, "Walker did not testify at the first trial and the Court gets the impression from reading the transcript of the trial that the principal defense relied upon was insanity; *the fact of the killing of Vaughn by Walker seems not to have been denied seriously." Walker v. Bishop,* 295 F.Supp. 767, 771 note 3 (E.D.Ark. 1967).

Walker, Russell Kumpe, and a prostitute, Linda Ford, were fleeing the scene of a shooting incident at a Little Rock night club when they were stopped by two police officers in separate automobiles. The first police automobile on the scene was driven by Officer Gene Barentine, and the second by the deceased, Jerrell Vaughan. The subsequent events were described in the first Arkansas Supreme Court opinion, *Walker v. State,* 239 Ark. 172, 388 S.W.2d 13 (1965) written by Mr. Oscar Fendler, one of Walker's present lawyers who was serving as a Special Justice of the Arkansas Supreme Court:

> Kumpe got out of his car by order of Officer Barentine, and came to the rear of the Oldsmobile; he leaned against Barentine's police car while the officer searched him. As this was being done, Officer Vaughan approached the passenger side of the Oldsmobile from the rear; as he reached the car door, gunfire broke out.

. . . . . .

Linda Ford, who was sitting in the front seat with Walker, said that he had a pistol in his hand and started firing when the door was opened. She did not know who opened the door, but the door was not open when Officer Vaughan walked up. Thomas Gerald Short, the cab driver, who was also present with the police, testified that Vaughan had bent over looking into the Oldsmobile window and said a few words. Short also stated that when the door came open, Vaughan was doing a little dance-like jig, trying to get away from the car and backed up on the side of the bank; that there was a shot and Vaughan fell on his chest; that he heard several shots; that he did not see any shots fired. He said that Vaughan had just got his gun out when he was shot.

*Id.* 388 S.W.2d at 14–15.

In the same opinion it was stated: "A surgeon removed the bullet from the deceased Vaughan, which was identified as having been fired by the .38 S & W 4-inch barrel pistol, which was found beneath Walker's body." *Id.,* 388 S.W.2d at 14. Walker had been shot five times and Vaughan once over the heart. "It can be reasonably inferred that Vaughan shot Walker several times before Walker's one bullet killed Vaughan." *Id.,* 388 S.W.2d at 17. Walker's sentence of death for first degree murder was reversed, principally because the trial judge did not instruct on the lesser degrees of homicide. "This is not to say, however, that the evidence is not sufficient to support a conviction of first degree murder." *Id.,* 388 S.W.2d at 17.

The second trial was begun on November 29, 1965. Walker was convicted of first degree murder and given life imprisonment. The version of the salient events given by Justice Cobb in the second Arkansas Supreme Court opinion, *Walker v. State,* 241 Ark. 300, 408 S.W.2d 905 (1966), closely parallels that given in the prior opinion:

> Officer Barentine stopped his car directly behind the suspect car. Vaughan stopped his car behind and to the left

side of the Barentine car. The driver of the Oldsmobile, later identified as Freeman Kumpe, got out and came around to the left rear of the Oldsmobile and met Barentine. While Barentine was beginning a search of Kumpe, Officer Vaughan went around the right rear of the Oldsmobile, ostensibly to check the other passengers in the car. Almost in the instant that Vaughan disappeared around the right rear of the Oldsmobile, a fusillade of gunfire erupted, the autopsy report subsequently reflecting that Officer Vaughan was killed by a bullet entering his body at the front side of his chest in the heart area.

. . . . .

She [Linda Ford] testified that appellant had a gun in his hand when he opened the right door of the Oldsmobile to meet Officer Vaughan and that appellant started shooting, being the first to fire. Appellant testified briefly in this case but at no time did he attempt to place a gun in the hands of Linda Ford. Since Kumpe was out of the car and unarmed; Linda Ford had no gun and Officer Vaughan was slain by a bullet fired into his body as he faced appellant, the physical facts leave little, if any, doubt as to the fatal bullet coming from a gun fired by appellant.

*Id.,* 408 S.W.2d at 908–09.

Judge Henley analyzed the defense raised in the second trial as follows:

It was the theory of the defense at the second trial that Vaughan was killed by a bullet fired from Barentine's gun which bullet had struck the Oldsmobile on the rear bumper and had, according to the defense, ricocheted striking Vaughan and inflicting a mortal wound. At the second trial Walker took the stand in his own defense and denied that he had fired any shots; he also denied that he had more than one gun; it was the State's theory that he had two.

*Walker v. Bishop,* 295 F.Supp. 767, 771.

In *Walker v. State,* 408 S.W.2d 905, 917 the Supreme Court of Arkansas affirmed the conviction in these words:

Appellant had no known reason to fear for his personal safety when his car was caused to slow down and pull over and stop by the police car behind it. Appellant opened the car door with a drawn gun in his hand and started the shooting with deadly accuracy. There is no suggestion in this record that he did not act of his own volition and with deliberation. The evidence in the case was certainly sufficient to authorize the jury in finding that appellant killed Officer Vaughan with deliberation, premeditation and malice aforethought.

The Supreme Court denied certiorari, *Walker v. Arkansas,* 386 U.S. 682, 87 S.Ct. 1325 (1967), and also denied rehearing and overruled his motion to present argument in support, 387 U.S. 926, 87 S.Ct. 2027, 18 L.Ed.2d 987 (1967).

The Honorable J. Smith Henley, then Chief Judge of the Eastern District of Arkansas, conducted an extensive habeas corpus hearing on August 28–30, 1967. It is not an exaggeration to say that Judge Henley virtually retried this case. Judge Henley's statement as to the crucial facts closely accords with that given in the two opinions of the Supreme Court of Arkansas:

Barentine had caused Kumpe to get out of the Oldsmobile and come back to the Barentine car to be searched . . . .

Vaughan left his car, walked between the Barentine car and the Oldsmobile and approached the right front door of that vehicle. That door was opened either by Vaughan or Walker and firing broke out. At the commencement of the shooting Kumpe either ran from Barentine or threw himself to the ground; Barentine fired twice at Kumpe; he then fired four shots into the Oldsmobile; reloaded and fired a fifth isolated shot into that vehicle.

Walker's case in the habeas proceeding was principally based on the testimony of two witnesses, Mary Louise Roberts and a cab driver, Paul Alderman.

Mary Louise Roberts and Linda Ford, two prostitutes, had been with Walker and

Kumpe at the Little Rock night club when Walker accidentally shot one patron while pistol-whipping another. Walker and Kumpe went to their motel, packed, and checked out. In the meantime Walker called Linda Ford at her mother's apartment and requested that she join them at the motel, which she did. Mary Louise Roberts went to the motel in a cab driven by Paul Alderman. "She undertook to join the two men and the Ford woman but was ordered back into the cab. The two men and Linda Ford entered the Oldsmobile and Kumpe took the wheel; all three occupied the front seat with the woman in the middle." *Id.* at 770. Kumpe drove through North Little Rock onto a narrow highway leading to England, Arkansas, where the vehicle was stopped by the two police vehicles. Alderman had attempted to follow but could not keep up with the Oldsmobile. His dispatcher alerted the North Little Rock police officer and instructed a cab driver by the name of Thomas Short to take up the chase. Short managed to keep contact with the Oldsmobile and arrived at the scene shortly after the police vehicles had stopped the Oldsmobile. The Alderman cab arrived a few seconds thereafter with Mary Louise Roberts, a passenger therein. "Mary Louise Roberts testified at the first trial that she and Alderman drove up to the other vehicles before the shooting started; however, she stated that when the firing began, she threw herself down in the back seat of the cab and did not witness the details of the shooting." *Id.* at 771.

Although the two women were subpoenaed by the State and police officials testified that diligent efforts were made to locate them, neither was served. Their prior testimony was read into the record. In the habeas hearing Mary Louise Roberts testified:

> [T]hat if she had been called as a witness at the second trial, she would have stated truthfully that she watched the entire shooting and never saw Walker do any shooting; that certain police officers knew that her second trial testimony would be favorable to the defense, and that she was made to understand that if

she appeared and testified she would be subjected to repeated arrests.

Judge Henley found "that the State made good faith and reasonable efforts to locate both women." He also observed that "the fact that Roberts did not 'see' Walker firing does not mean he was not doing so." *Id.* at 776.

The other witness, Paul Alderman, who was driving the cab occupied by Mary Louise Roberts, moved to Florida shortly after the shooting and did not testify in either trial, but was a witness at the habeas corpus hearing. The defense claimed that "had he been called, he would have given testimony which, if credited, would have entitled Walker to an acquittal; that the State knew of this potential testimony and wrongfully failed to disclose its knowledge to the defense." *Id.* at 777. Judge Henley summarized Alderman's testimony at the habeas hearing as follows:

> Alderman testified in substance that he witnessed the shooting; that he saw Vaughan shoot Walker; that when the firing commenced, Kumpe threw himself to the ground; that when the "flurry" or "flurries" of shooting died down Vaughan was on his feet, apparently unhurt; and that Walker was on the ground. Alderman proceeded to state that there was then a final shot which had a hollow, muffled sound as though fired from a can, and that Vaughan fell immediately after that shot.

*Id.* at 777. He noted that Alderman's testimony as to events at the shooting was quite graphic, but "when his testimony came down to facts which would bear directly on whether his testimony at the trials was suppressed he became very hazy with respect to many details which the Court thinks he would have remembered normally." *Id.* at 779.

Judge Henley denied the habeas petition and was unanimously affirmed by a panel of the Court of Appeals. *Walker v. Bishop,* 408 F.2d 1378 (8th Cir.1969). The recitation of the facts in Judge Mehaffy's opinion accords with the version stated by the

Supreme Court of Arkansas in its two opinions and by Judge Henley. *Id.* at 1380–81. "Linda Ford, who was seated next to Walker, testified that Walker fired the first shot and there is no question but that Vaughan was killed by a shot from the pistol found under or by Walker's side." *Id.* at 1381.

With regard to the charge that the State had suppressed vital evidence and used false testimony to prove the conviction of Walker, the Court of Appeals stated, "Some of the charges are specious and, as will be seen, all are completely without merit." *Id.* at 1383. The Court further noted that "the State offered defendant, on more than one occasion, any and all evidence from the State's file, which defense counsel desired...." The Court of Appeals opinion pointed out that the principal complaint in connection with the charge of supression was the State's inability to serve subpoenas on the two prostitutes, which permitted their testimony to be read in the second trial. "The uncontradicted evidence is that the State used every available means to locate these witnesses without success." *Id.* at 1384.

With regard to the testimony of Alderman, the Court said that "even a reading of this witness' testimony in the cold record reflects its incredibility." *Id.* at 1387. As the Court went on to point out:

> In the first place, his was the last of the five cars to arrive at the scene. The Walker car was the lead car and pulled slightly off the highway on the righthand side. Officer Barentine's car was immediately behind the Walker car. It was Barentine who stopped the Walker car. Officer Vaughan's car arrived immediately and he pulled towards the center of the narrow highway. The next car to arrive was the cab which had passed Alderman's cab. It was only after this that Alderman's cab arrived, and it was parked angling towards the left side of the highway. It was somewhere near 2:00 o'clock in the morning, and dark. It seems impossible from a physical standpoint for Alderman to have seen anything that transpired in connection with

the shooting after he arrived because the murder was committed at the front door of the lead car where Walker was seated, as Officer Vaughan approached the Walker car.

*Id.* at 1387.

In affirming Judge Henley, the Court of Appeals wrote: "Our canvass of the entire trial record as well as the record of the habeas corpus proceeding clearly convinces us beyond question that defendant was afforded a fair trial and that none of his constitutional rights was denied." *Id.* at 1390.

For the time being, the habeas appeal ended Walker's legal efforts to obtain his freedom. After he began serving his sentence, he became a "born again Christian" and began to participate in church meetings all over Arkansas, admonishing the audiences against a life of crime. Walker was given numerous furloughs to participate in this type of activity. In 1975 he failed to return from such a furlough, went to California, changed his name, and disguised his appearance. Five years later an arrest on a drug charge revealed his true identity, and he was extradited from California to Arkansas after a highly publicized campaign in his behalf by west coast celebrities. An order from the Supreme Court of California temporarily blocked Walker's transfer to Arkansas. *In re Walker on Habeas Corpus*, Crim. No. 21422 (Cal. April 19, 1980). The Supreme Court of California directed the Superior Court of El Dorado County "to conduct hearings to determine 'if the penitentiary in which Arkansas seeks to confine petitioner is presently operated in conformance with the Eighth Amendment of the United States Constitution' and thereafter to decide the petition on its merits." The Supreme Court of the United States reversed, *Pacileo v. Walker*, 449 U.S. 86, 101 S.Ct. 308, 66 L.Ed.2d 304 (1980) holding that Article IV § 2 and its implementing statute "do not give the courts of the 'asylum' or 'sending' state authority to inquire into the prison conditions of the 'demanding' state." *Id.*, 449 U.S. at 87, 101 S.Ct. at 309.

After his return to Arkansas, Walker filed a habeas corpus claim and a claim under 42 U.S.C. § 1983. Under the latter statute Walker claimed that his life was in danger in the Arkansas penitentiary and requested that he be transferred to a federal penitentiary or a prison in another state. This court denied his request for transfer. Walker was, however, confined in the diagnostic center, where he did not have contact with the general prison population. In August of 1983 the Court of Appeals ordered that Walker be transferred out of Arkansas, and he is now confined in the Federal facility at El Reno, Oklahoma. *Walker v. Lockhart,* 713 F.2d 1378, 1383 (8th Cir.1983).

In his habeas petition Walker alleged the following grounds:

a. That the presiding trial judge at his murder conviction, Judge William Kirby, was biased against the plaintiff.

b. That there was official misconduct in the plaintiff's trials in state court in that the North Little Rock Police Department allegedly withheld exculpatory evidence and witnesses from the plaintiff.

c. That prejudicial pre-trial publicity made it impossible for the plaintiff to receive a fair trial before a fair and impartial jury.

d. That the plaintiff's principal attorney was intimidated, threatened and consistently interfered with by the trial court, police officers and other officials in a manner that prevented him from adequately defending the plaintiff.

e. That there is newly discovered evidence that exonerates the plaintiff.

f. That the sum total of the various alleged defects in the plaintiff's state trial were so serious as to shock the conscience of the court into violating his constitutional rights to a fair trial.

g. That in the prosecution of his prior habeas corpus petition, his rights to due process were abridged when rep-resentatives of then Governor Winthrop Rockefeller allegedly induced him not to apply for a writ of certiorari to the United States Supreme Court subsequent to the ruling of the Circuit Court of Appeals for the Eighth Circuit denying him habeas relief.

*Walker v. Lockhart,* 514 F.Supp. 1347, 1349–50 (E.D.Ark.1981).

I found that grounds (a), (b), (c) and (f) had been thoroughly litigated before Judge Henley and that pursuant to 28 U.S.C. § 2244, these matters should not be relitigated. *Id.* at 1350–51. I agreed to hear evidence on points (d), (e) and (g). The Court of Appeals has succinctly summarized my rulings after I heard the habeas claim on its merits:

> The district court heard evidence on only two of the three grounds since the claim of newly discovered evidence was candidly abandoned at the outset of the hearing. [H. II, 173–74.] The district court considered Walker's due process claim and found it to be without merit. Although Walker's counsel decided to abandon this claim following presentation of the evidence, the district court found there was no credible evidence in the record to report it. [H. II, 365, 499.] Finally, the district court ruled that Walker's claim of ineffective assistance of counsel was unsustainable. At the habeas hearing Walker's former counsel who had assisted in representing him at trial clearly testified that he was not intimidated. [H. II, 369, 500.] The district court found that Walker had received an excellent defense by two experienced attorneys, that there was no intimidation by the trial judge or by the North Little Rock Police Department, and that Walker's defense had been praised in glowing terms by this court. [H. II, 499–500.]

*Walker v. Lockhart,* 726 F.2d 1238, 1249.

The majority opinion affirming the denial of habeas corpus summarized the evidence

which it considered to be indicative of Walker's guilt as follows:

First, Linda Ford, the passenger in the middle seat of the Oldsmobile driven by Kumpe testified that after she was pushed into the car Walker sat to her right with a gun on her. [R. II, 605.] When the car stopped at the scene, Ford saw Officer Vaughan approach the passenger side of the car and saw that Walker still had the pistol out. [R. II, 607–08.] When the door opened, Walker started firing. [R. II, 608.] She then heard several shots. [R. II, 608.] She knew that Walker had fired first because she could see the fire from Officer Vaughan's gun when he fired. [R. II, 609.] Second, Thomas Short, the cab driver who arrived on the scene almost contemporaneously with Officer Vaughan, saw Vaughan approach the passenger side of the Oldsmobile and bend over looking into the window to talk to someone. [R. II, 518; H. I, 2933–94.] After a few seconds, the car door suddenly opened. [R. II, 518.] Officer Vaughan jumped backwards, pulling his gun as he did so. [R. II, 518; H. I, 295.] While Vaughan was dancing backwards, Short heard a shot and saw Vaughan's feet fly out from under him. [R. II, 519.] Altogether, Short heard one shot and a pause and then four or five more shots fired in succession, "real rapid like." [H. I, 295.] After the shooting was over, Short walked around and saw one of the police officers kick a gun out of Walker's hand. [H. I, 298.] When Walker was turned over, Short saw another gun underneath him. [H. I, 299.]

Finally, Captain Paul McDonald, a qualified ballistics expert, testified that the bullet removed from Officer Vaughan's body matched the four-inch barrel .38 caliber Smith & Wesson, [R. II, 767], which was identified as the weapon found under Walker.

*Id.* at 1245–46.

The principal contention on appeal from this court's prior habeas ruling was that the issue of the bias of the trial judge should have been considered due to an intervening change in the law. The majority rejected Walker's argument that there had been a change of law with regard to bias of a trial judge. Walker also argued "that the ends of justice would be served by reexamining the bias issue, based on the weakness, or insufficiency, of the evidence giving rise to his conviction." 726 F.2d at 1245. Although Walker did not raise the sufficiency of evidence argument in the 1967 or 1981 habeas petition, the majority nevertheless addressed this argument fully but concluded that "any rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307 at 319, 324, 99 S.Ct. 2781 at 2791, 61 L.Ed.2d 560. "Thus, the insufficiency of the evidence argument of Walker does not, under the ends of justice, justify reexamination of the issues raised again in the second habeas petition." 726 F.2d at 1248.

Subsequent to the affirmance of the habeas rejection and the denial of certiorari by the Supreme Court of the United States, *Walker v. Lockhart*, —— U.S. ——, 104 S.Ct. 2168, 80 L.Ed.2d 552 (1984), the Court of Appeals granted a recall of mandate based on an entry in the diary of Russell Kumpe made available to defense through Kumpe's ex-wife, Peggy Davidson, after this case was decided by the Court of Appeals. The State countered the evidence of the diary entry with its own evidence of a taped confession made by Walker. *Walker v. Lockhart*, 726 F.2d at 1265 (8th Cir. 1984).

The Eighth Circuit gave the following instructions to this court:

The case is remanded to the district court with instructions to take evidence from Russell Kumpe and his former wife, Peggy Davidson, relating to Kumpe's alleged firing of a gun at or near the time that Officer Vaughan was shot on the night of April 15–16, 1963. That evidence is to include the diary entry apparently dated January 16, 1968, relating to that incident.

On remand, the State may offer as evidence the recorded confession of Walker allegedly made after his first trial. Walker may offer evidence to explain that alleged confession.

The remand proceedings may be limited to the receipt of the evidence mentioned by both sides in their papers with respect to the recall of mandate, including the Kumpe statements and the recorded confession of petitioner and any explanation thereof and such additional evidence as the district court in its discretion may deem relevant to these proceedings.

The district court should determine whether any of this evidence is credible enough to deserve the attention of a jury; whether the evidence would be admissible if a new jury trial were held; and whether the new evidence, when considered against the background of the existing record, sufficiently tips the balance of the "ends of justice" standard to require that a new trial be held. These findings should then be certified to this Court, sitting en banc, which can then consider, after briefing and oral argument, whether the new evidence, in the light of the district court's findings, requires a new trial.

*Id.* at 1265.

## II. THE TESTIMONY

### KUMPE'S ACCOUNT OF THE FATAL SHOOTING

The central figure in the hearing ordered by the Court of Appeals is Russell Kumpe. It was the entry by Kumpe in his diary that caused the Court of Appeals to recall the mandate. Kumpe testified at great length and without any apparent reservations.

Kumpe's narrative account of the events leading to the murder is as follows. After the altercation at the night club, he and Walker went to the Travelodge Motel. Walker cleared their belongings out of the room, and Kumpe paid the bill. Linda Ford appeared, and Walker, over the protest of Kumpe, insisted that she accompany them. (T. 100, 101). As they left the motel, Kumpe observed a cab following them, and he thought he saw in the cab a woman with a distinctive hairdo such as that worn by Mary Louise Roberts (T. 103). Kumpe lost the cab in North Little Rock (T. 103). Walker and Kumpe discussed what to do in the event they were stopped by the police. Walker said he could not afford to be arrested because he was wanted in Nevada. Kumpe said he could not afford to run from a simple assault charge because he was not wanted. (T. 103.) At the stoplight where the England Highway (No. 130) intersects with Highway 70 and where they turned right on the arrow, they realized they were being followed when a police car ran the light and began to close in behind them (T. 103). Kumpe stopped in obedience to the police car signal. Officer Barentine ordered him out and ordered the others to remain in the car. (T. 105.) Kumpe was told to walk back with hands in front. Walker asked him before he left the car if he had that "piece." Kumpe replied, "No, it's under the seat." (T. 105.) Barentine told him to "spread eagle the police car," so he leaned down with both arms out but looked down toward the Oldsmobile (T. 105, 106.)

> And while I was looking down Walker cracked the door and when he did the dome light came on and I could see that he had a pistol in his hand. And about this same time Vaughan came up and he parked directly behind Barentine but slightly to the right so the two police cars were behind one another.
>
> And as he approached the car, Barentine was still—was still in the process of searching me. And Barentine told Officer Vaughan, he said, "I've got this one. Get the others out of the car."

(T. 106.) When Vaughan got even with the front fender of Barentine's car and Barentine told Vaughan, "I've got this one, you get the other two," Kumpe told Vaughan, "Let me get him out of the car. He's got a gun." Vaughan told Kumpe that he had a gun and he'd get the SOB. "And as he approached the car, the door—the door came open and Vaughan shot Jim and Jim returned the fire and shot and killed Vau-

ghan." (T. 107.) Vaughan fired two shots first, then Walker fired. He saw one more flash and then "took off." (T. 107.) "Barentine had backed up and unholstered his gun and when I swung off the car, I bumped him and he shot me." (T. 107, 108.) He shot me once in the wrist and once in the lower back side. "I ran around the police car. I got the police car between Barentine and myself and I stopped and looked back through and he was standing slightly to the left of his left front fender firing down toward Walker and the Oldsmobile." (T. 108.) "Walker shot back toward us ... I saw flashes of the gun (T. 108)." Kumpe maintained that he was still on the police car when the shooting started (T. 108). "I was still in the process of being searched and was still spread eagled over the hood of the police car (T. 109)." Kumpe denied that he had a gun (T. 109). When they left the motel, they had three guns—one was on the front seat of the Oldsmobile, one was stuck in Kumpe's waistband, and Walker had a gun of his own (T. 109).

On redirect Kumpe stated that he brought two of the guns to Arkansas—both given to him by Jim Ing (T. 111). Kumpe testified that "on the night of the incident both of those guns were at one point in time in my possession and when we left the motel one of the guns was placed on the seat of the car and the other one was stuck in my waistband, and when I left the car, the gun that was in my waistband was placed under the driver's seat. Now which gun is which I don't know." (T. 112.) He had a gun in a briefcase, which he took out and placed on the seat (T. 115).

Kumpe has not testified in any of the previous proceedings in this case. A review of his account of the events on the night Vaughan was killed closely parallels the version given by Officer Gene Barentine, Linda Ford, and the cab driver Thomas Short. Mary Roberts in her testimony in the state court proceeding said, "I don't know what happened, but just a lot of shooting started." She did testify that the shooting started immediately after she arrived in her cab. "Kumpe was standing back to where the policeman was." (State Trial T. 534.) Paul Alderman, the driver of the cab in which Mary Louise Roberts was riding, gave a different account, but his testimony was discounted and rejected by both Judge Henley and the Court of Appeals, as noted *supra*. Alderman only testified in the hearing before Judge Henley. Kumpe disputed the testimony of Alderman and Roberts that they were present at the shooting (T. 80). When Kumpe ran from Barentine, he saw the Alderman cab arriving on the scene (T. 81).

### THE DIARY ENTRY

Kumpe's unsworn, out-of-court statements present the problem in this case, and I have been directed to take testimony with regard thereto and the Court of Appeals specifically directed that the diary entry by Kumpe on January 16, 1960 be a principal subject of inquiry. The diary came to light when Peggy Davidson, Kumpe's ex-wife, came across some of Kumpe's belongings while cleaning out a closet on November 15, 1983 (T. 182). She turned it over to one of Walker's lawyers (T. 184). It is apparent that Ms. Davidson bears much animosity toward Kumpe. She admitted having shot him with a .22 rifle shortly before their divorce (T. 183). Kumpe claims she shot at him on another occasion (T. 621). During her marriage to Kumpe, she saw Walker on several occasions at church meetings and once when he came to a bakery where she worked accompanied by the prison chaplain (T. 186).

Kumpe admitted keeping the diary or "notes" as he characterized the document. Kumpe related that the purpose of the diary was to record conditions at the penitentiary (T. 140). He thought he could make money from his notes (T. 140). He corresponded with Murton, the former prison superintendent who was writing "Brubaker," and he gave Murton some of his notes (T. 140). He had a close relationship with Murton and thought they were supposed to collaborate on the book. "I guess I would say he kind of stiffed me. He used a lot of my information and kept the mon-

ey." (T. 141.) He did not deny making the entry in question, which reads as follows:

Awakened at 1:30 a.m. by night sheriff, told only to go to Mr. O.'s office—Emergency. A great deal of agitating being done by James Dean Walker. I look at him and feel much remorse that I fired too high 4–16–63. He, according to rumor has vowed he will kill me at first opportunity. I do not underestimate his potential, but am not alarmed. I meet Walker this noon in the dining room. He does not speak nor do I. He is self styled or appointed spokesman for rank men.

(PX 1.)

Kumpe's explanation was that he was writing the diary while he was alone. He kept it in a desk drawer and wrote with his hand in the drawer (T. 40). He meant to write that he was sorry he (meaning Gene Barentine) fired too high (T. 41). He felt resentment at Walker over the incident because it resulted in his receiving a 21-year sentence (T. 41). Kumpe further explained his statement that Barentine fired too high as follows: "Well, Mr. Barentine was firing rather wildly and he certainly was shooting over Mr. Walker if Mr. Walker is down in the position where he was, and he's shooting through the Oldsmobile so certainly he's firing too high." (T. 54.)

Before making the diary entry, Kumpe testified that he was awakened and told to go to the office of the farm manager and there asked to intecede with Walker who was "agitating a work stoppage." He talked to Walker "who told me goodbye." Both Kumpe and Walker were agitated. It was under these circumstances that he wrote the diary entry (T. 137).

## THE CONVERSATION WITH KUMPE AT THE LUAU APARTMENTS

Ms. Peggy Davidson married Kumpe on August 5, 1968. They were divorced in July, 1975 after separation in April, 1975. (T. 172.) She related a conversation with Kumpe while they were living at the Luau Apartments in Little Rock in the apartment of the manager (T. 173). An unnamed man was also present. Kumpe told the group that "he put his gun behind his pants and he got out and said he started to spread eagle on the car and he was pressing against the car so he wouldn't find the gun." (T. 175.) He also told them "that he (Barentine) was just going to start to search him when Vaughan's car came up, and he said Vaughan started around the car, and when he got to the door Kumpe said, 'He's got a piece,' and added, 'All hell broke loose.' Kumpe said he started to move and Barentine shot him, and he fell down under the car." She assumed it was the car they were in. "And he said in all the confusion and so many cops and so much gunfire and everything that he managed to crawl away and he said he buried a key, and that a car came through. It was an older model car. He thought it was a Nash. It had a funny exhaust. And he said he put the gun up in the exhaust and then the cops made the car move on out." (T. 176.) He did not say anything about firing a gun himself (T. 177–78). When the shooting broke out, Kumpe got down underneath the Oldsmobile and crawled away and got rid of the key and the gun (T. 178). After they returned to their own apartment, Ms. Davidson related the following colloquy with Kumpe:

A We got downstairs, and I said, "Russell, you shouldn't tell that. The way you tell that," I said, "it sounds like you did it." And he kind of grinned and he said, "I did." I said, "Oh, you did not." And it just sort of went from there. I didn't believe it. You know, I said, "Oh, you did not."

(T. 178.) Kumpe told her on another occasion that he only made one mistake. "He didn't kill James Dean Walker, too." (T. 179.) On another occasion he told the story about the officer's missing the gun (T. 180).

Kumpe responded to his ex-wife's testimony about the Luau apartment conversation as follows. He married Peggy Davidson in August, 1969 and divorced her in July, 1975. In the fall of 1969 he and his wife lived at the Luau Apartments, 17th and Center, Little Rock. He recalls talking

about the Walker case on one occasion when his wife, the apartment manager and another man were present. (T. 28.) He did not tell them that when he was searched by Barentine, he pressed against the fender so his gun would not be found (T. 30). He did not tell them that he hid the gun in the exhaust of a vehicle (T. 31) or that he buried a key to a safety deposit box in St. Louis (T. 31). However, he did have a key to a safety deposit box in an envelope which he covered with some leaves (T. 32). He does not recall his wife's saying to him, "The way you told it, it sounds as if you did it." (T. 34.) He emphatically denies responding to this statement, "I did." (T. 35.) He and his wife on several occasions went to hear Walker speak at various churches (T. 35). He denies telling his former wife that his "only mistake on the night in question, April 16, 1963, was not killing James Dean Walker, too." (T. 36.) Kumpe testified that he "did not ever tell her (his ex-wife) or anyone else that he shot Vaughan" (T. 80).

## KUMPE'S ALLEGED CONVERSATION WITH BILLY EARL JOHNSON

Billy Earl Johnson, a witness for Walker, now lives in Memphis. He has been convicted of more than one crime in the last ten years (T. 198). He last received a three-year sentence for theft by deception and has also been convicted on drug charges (T. 198). He worked with Kumpe at the prison from July to September, 1983. Kumpe told him that when the officer searched him, "The stupid M–F missed my pistol." He also said that "while the officer was in the process of frisking him, shooting broke out.... The M–F shot James Dean five times." (T. 207.) Kumpe "at that time hit the deck and Barentine shot him." (T. 207.) Kumpe told him he crawled off in a field and "said something about Officer Barentine shot him and then shot—started shooting at Walker and where Officer Vaughan was." Kumpe claimed that Barentine panicked and just started shooting. (T. 209.) "And then at a later date he—I guess he had forgotten telling me about crawling in a field. He

said he stashed the—had another car he pulled up somewhere nearby and he stashed the gun up under it somewhere." (T. 209.) Johnson claimed that on another occasion Kumpe told him that Barentine shot Vaughan and that he, Kumpe, made a deal to be tried for assault at the night club instead of accomplice to murder and that his sentence would be later reduced (T. 211).

On cross-examination Johnson admitted he had been in prison five times (T. 217). He is an admitted writ writer and prison litigator who admitted that he received information from Kumpe that Vaughan was killed by Barentine and did not relay this information to the prison authorities, prosecutor, or anyone else until he was contacted recently by Walker's lawyers (T. 221). His explanation was as follows: "I was hurt and injured while in the Arkansas Department of Corrections, filed various writs trying to get medical treatment, even, I think some to your court. I was not very enthused about going to the officials there ...." (T. 221.)

Kumpe categorically denied telling Johnson that Barentine had missed a gun tucked in his waistband (T. 50). Kumpe said that once Johnson asked him, "Did Walker kill Vaughan?" He replied, "Well, no, Johnson, he committed suicide." (T. 51.) He also denied telling Johnson that he crawled underneath a car and stashed a gun (T. 52).

## KUMPE'S ALLEGED CONVERSATION WITH HIS SISTER AT THE ARKANSAS PENITENTIARY

Kumpe was visited at the prison by his now deceased sister, Mildred Eisner of Memphis, between July and November, 1963. After his conviction in July, 1963, she visited him several times (T. 67). Kumpe was shown a document purported to be a transcript of a conversation with his sister. Kumpe would not admit to having made the statements contained therein. (T. 76.) He was asked about a statement, "You understand that I did shoot at that

policeman." (T. 73.) Kumpe said that if he made such a statement, he lied "to pressure her into acting with a little more haste." (T. 74.) In answer to a question from the Court, Kumpe stated that he could not say that he had the conversation set forth in the transcript. He testified that from time to time, when his sister was visiting, he did discuss certain items related in the transcript. (T. 127.) Kumpe was asked by the Assistant Attorney General about a statement in the purported transcript of the conversation with his sister as follows: "The policeman committed suicide. He shot Walker first. See, if he doesn't shoot Walker then we don't have all the trouble and he is still alive. What would you do if someone shot you first?" (T. 96.) He was asked whether this seemed to show that he, Kumpe, was telling his sister that Walker shot Vaughan. Kumpe replied, "I suppose so." (T. 97.)

David White, Assistant Director for Public Relations of the Arkansas Prisons, testified that he had never run across evidence of inmate visits being surreptitiously recorded (T. 317). He has been with the prison system eight years (T. 308).

A great deal of testimony was directed toward the question of when this document came into the hands of Paul McDonald. McDonald is now the Chief Firearms Examiner for the State Crime Lab (T. 426). McDonald claims he came across it while looking for the Walker-Karam transcript and gave it to Prosecuting Attorney Bentley, who gave it to Assistant Attorney General Holder, who gave it to Walker's attorneys. McDonald has been with the State Police since 1947. He was with the Criminal Investigative Division (CID) from 1950–65. He headed CID from 1960–65. CID has a liaison man with the Cummins facility of the penitentiary at certain times. (T. 436.) At times no one did this work (T. 438). McDonald does not recall the CID's receiving any documents from their liaison man at Cummins (T. 439). McDonald identified the transcript of the alleged conversation between Kumpe and his sister as a document in his possession. It was marked Plaintiff's Exhibit 2. Plaintiff's Exhibit 11 is the same except that a portion is highlighted (T. 442). It was highlighted by McDonald for the benefit of Prosecuting Attorney Bentley (T. 444). McDonald testified that Bentley had called him in February or March, 1984 and asked him to search his files for any information about the Walker case (T. 444). McDonald testified as a ballistics expert at both of the state trials of Walker and also at the habeas hearing before Judge Henley (T. 445). He did not have this document at the time of the three trials (T. 445).

While searching his files at the request of Bentley, "he found an envelope that he had received from W.A. Tudor and the document was inside the envelope" (T. 446). "We recently moved into our new headquarters building and in the process of moving we had a lot of files that I had boxed up. Now it was found in one of the boxes that I had boxed from a locked cabinet that I kept some files that I wanted to keep locked." (T. 448.) The CID did not have a criminal investigation file on Walker. "We never did actually participate in the investigation of the James Dean Walker case at all other than the scientific evidence, the processing of some scientific evidence. So outside of those files, I knew of none that existed." (T. 448). McDonald testified that the document in question came to his attention sometime in the last ten years (T. 486). He did not have this document at the time of the trial or the habeas hearing before Judge Henley (T. 507). It was not in a file (T. 510). The only files he had on James Dean Walker were the ballistics files (T. 509). The document was in the envelope with the material he had received from W.A. Tudor (T. 510). (Tudor admitted sending some material but not this document (T. 465).) McDonald was not aware of a practice to record conversations of inmates with visitors (T. 511).

The transcript of a television interview with Paul McDonald was introduced as Plaintiff's Exhibit 12 (T. 12). In the transcript is the question or statement, "This thing that's been around since 1963, I guess when you were with the CID?" The

answer by McDonald was "Yeah." McDonald answered in explanation that he was referring to the date on the transcript. (T. 478.) In the transcript appears a question by a television reporter: "Mathis—Well, here's what I want to know: Why—this is dated 1963—that's twenty-one years ago. Why is this just now being turned over to any attorneys—defense attorneys, prosecuting or anyone." (T. 478.) McDonald answered, "I don't know." (T. 478.) Then the reporter said, "But you knew about this in 1963." He answered, "In 1963 I did." (T. 479.) It is not clear to me whether this is an answer to a question by McDonald or a rhetorical question repeated to the questioner. McDonald said, "I either didn't understand the question, or I was trying to answer questions that I couldn't answer." (T. 477.)

### KUMPE'S INTERVIEW WITH MIKE MASTERSON

Mike Masterson, a witness for the petitioner, is an investigative reporter for the *Arkansas Democrat* (T. 236). He interviewed Kumpe at the Cummins Prison on February 8, 1984. According to Masterson, Kumpe had a revolver in his waistband which Barentine missed in his search because he was "leaning hard against the front of the car to prevent the detection of that pistol. He said that at that point gunfire broke out, that Officer Barentine shot him, and that he denied going under the car." He told Masterson that he broke and ran into the bushes and crossed the highway and in the process stuffed the gun in the exhaust system of a Nash Rambler being driven by an older couple. (T. 240.) Kumpe denied to him having fired a shot that night (T. 241). When he showed Kumpe copies of the diary, he threatened to sue him if he printed it (T. 243). He told Masterson that he intended to write "Barentine" in the sentence about "firing too high," but the light was bad and he made a mistake (T. 246). Kumpe denied telling Masterson that he had a gun in his waistband (T. 88). Kumpe testified that after he was spread eagled against the police car, Barentine did a thorough job of patting him down and searching him. "I will testify that if I'd had a gun in my waistband he could not have missed it at his searching." (T. 132.) Kumpe denied telling Masterson he was armed when he left the automobile (T. 44) or that he had disposed of the gun (T. 46).

### KUMPE'S ALLEGED CONVERSATION WITH WARREN BROOKS

Warren Brooks, a witness for plaintiff, was formerly a guard at the prison in early 1968 (T. 264). He testified that Kumpe had told him that Walker was passed out and could not have fired a shot at the time Vaughan was killed (T. 265). Brooks knew Walker at the prison and liked him (T. 268). He questioned whether Walker was guilty (T. 268). Brooks did not report the conversation with Kumpe to any of the prison officials (T. 269) or the Prosecuting Attorney (T. 270). He first reported the conversation to Mr. Masterson (T. 270). He had gotten in touch with Masterson at the instance of Kumpe's ex-wife, Peggy Davidson, who was a good friend of his (T. 270). Kumpe denied making the above statement to Brooks (T. 26).

### THE MELODY BEATTIE INTERVIEW

Melody Beattie, a witness for petitioner, is a writer from Stillwater, Minnesota. She became interested in the James Dean Walker case after being contacted by Oscar Fendler, one of Walker's lawyers. Her husband is director of a therapeutic community which is "a long-term residential treatment center for drug and alcohol addicts with a criminal background." (T. 279.) She claimed that A.L. Lockhart, the Arkansas prison superintendent, threatened her husband's life when he came down to transport two inmates who had gained executive clemency back to Minnesota (T. 274).

She met Kumpe at a cafeteria in Pine Bluff on June 5, 1982 (T. 276). "He told me that he had a gun on his person, I believe tucked in his belt after he got out of the car and after he was searched by

Officer Barentine." (T. 278). He secreted the gun on the underside of a Nash automobile, and it left the scene with that automobile (T. 278). Ms. Beattie also testified that when Mr. Holder, the Assistant Attorney General, was in St. Paul arguing the Walker case on appeal, Mr. Holder said that he agreed with her husband's belief that Walker was innocent (T. 286). Holder denied making such a statement or "any statement which could have in any way led her to believe that that was what I intended to say" (T. 625). Kumpe denied making the admission about which Ms. Beattie testified (T. 90). He denied telling her that he had a gun when he got out of the automobile and that the gun was left under a Nash Rambler (T. 47).

## THE GEORGE BENTLEY INTERVIEW

George Bentley, a reporter for the *Arkansas Gazette*, was called as a witness by plaintiff. His paper was contacted by Kumpe, who complained about the coverage the *Arkansas Democrat* was giving the Walker story. He volunteered to tell the true facts to a "capable journalist" (T. 287). Kumpe told Bentley that Vaughan fired the first shot (T. 293) and that he had fired three times (T. 293).

## THE WILBUR C. BENTLEY INTERVIEW

Wilbur C. "Dub" Bentley, the Prosecuting Attorney for the 6th District including Pulaski County, was called by plaintiff. He testified concerning a tape recorded interview with Russell Kumpe, on March 2, 1984. The transcript of this interview was introduced as Plaintiff's Exhibit No. 9. Bentley had previously interviewed Kumpe at the Prison sometime before the tape recorded interview. Kumpe told essentially the same story at the Prison as told in the tape recorded interview (T. 330). The transcript of the tape recorded interview closely parallels the story Kumpe related in his testimony during this trial. Although the transcript does not mention Walker's firing back in the direction of Barentine and Kumpe, Bentley testified that this was related by Kumpe in the prison interview (T. 335). When Bentley reopened his investigation of the Walker case, in February or March of 1984 he talked to Paul McDonald of the Arkansas State Police and learned that they had a document which purported to be an interview recorded at the prison between Russell Kumpe and his sister (T. 341). By April he would have been aware of this document (T. 342). About a month before the hearing, he gave a copy to Mr. Holder (T. 346).

## WALKER'S STATEMENT AT THE PULASKI COUNTY JAIL

Paul McDonald, Arkansas State Police, testified that he was directed to go to the office of Col. Herman Lindsay, Superintendent of State Police, in May, 1964. Lindsay had received a request from Governor Faubus for State Police assistance in making a tape at the request of Jimmy Karam. (T. 523–24.) He assigned Sgt. Koffman to go to the county jail and comply with the request. Upon his return Koffman turned the tape over to McDonald. (T. 526.) It has been in his possession ever since and, as far as he knows, no copies were made (T. 526).

Gene Koffman, a retired Sergeant with the Arkansas State Police, testified about taking and recording a statement of Walker at the Pulaski County jail (T. 539–54). He was present together with Karam and Walker (T. 541). Nothing of significance is missing from the tape (T. 546). The tape was received in evidence along with a transcript (T. 547). The damaging part of the transcript, as far as Walker is concerned, reads as follows:

And I come to Little Rock, Arkansas, and again, I was drinking and that led to a fight up here in a nightclub. Now, it's led to murder. I killed a man out here, plus ... it's probably late now to say that it wasn't done intentionally, but it wasn't. I know a lot of people don't see it that way, but, ah, I was here in this Little Rock Pulaski County Jail here, and even after I was here for about seven months, I still didn't ... I thought that

the only way out of it was through the people that I knew before, you know, through some kind of graft or sin. Something I could make me get out of it .... One day we were having a prayer, and I asked the Lord to forgive me if he could for my sins that I had committed because I had committed I can say, ah, every sin imaginable ... stealing up to adultery, fornication ... murder, even.

.  .  .  .  .

KARAM: And, too, I think last Sunday you said to me that, ah, you knew Jesus had forgiven you now and you hoped that this young officer's family and people could forgive you.

WALKER: Yes, I know it's hard on you to take a life. For this woman felt ... for this caused a lot of bitterness in her heart, and I can understand that. Her husband's dead and that in some way, I don't know how, I would like to tell her that ... I know "I'm sorry" doesn't say very much, but ... that's how ... it's a terrible thing to have happen.

(DX B, 3–5.)

Jimmy Karam testified that he is in the clothing business (T. 555). Prior to May, 1964, he became acquainted with Walker when he (Walker) was baptized (T. 555). He secured the tape to be used by Billy Graham (T. 557). A man named Alton Carter was present when the tape was made (T. 558). No one with the Arkansas State Police was present (T. 559). He feels like he sent Dr. Graham a copy of the tape, but doesn't know if he used it (T. 560). He doesn't know where the original tape is located (T. 568). Karam's voice is on the tape (T. 569). Karam stated that the tape appears to be an accurate representation of the conversation he had with Walker (T. 569) "excepting that I undoubtedly gave him something because he said he read part of it."

## WALKER'S CONVERSATION WITH RAY CARNAHAN

Ray Carnahan is with the Arkansas State Police (T. 151). On August 27, 1973 he was instructed to pick up Walker and bring him to a speaking engagement at a church in Little Rock. During the trip from the penitentiary, Walker told him that "he had gotten into the wrong crowd as a young man and that one thing led to another and the night that the officer was killed that he didn't want to go to jail and he shot the officer." (T. 152.)

## JAMES DEAN WALKER'S EXPLANATIONS OF HIS ADMISSIONS

With reference to the statement given to Jimmy Karam, Walker stated that Alton Carter, one of the men who had visited the jail after his conversion, "asked me if I would be willing to share what had happened with me so that other people, young people might not face the same circumstances." Later on a Sunday Carter brought Jimmy Karam for a visit. (T. 647.) Several days later Mr. Karam and Carter took his tape recorded statement (T. 648). No police officer was present (T. 648).

Walker explained the statements in the Karam transcript as follows:

Q. Would you turn to Page 4, the second line towards the end, if you would just read that sentence.

A. "Now, it's led to murder." By this I meant exactly what we were talking about earlier at the opening of this thing, I am here to accept this verdict that the jury has given, that is, a guilty of first degree murder verdict.

Q. Now, if you would go back and read the line before "Now, it's led to murder", and then—including also the line "Now it's led to murder". "And I", it begins on the previous page.

A. "And I come to Little Rock, Arkansas, and again, I was drinking and that led to a fight up here in a nightclub. Now, it's led to murder".

Q. And then what is the next line after that?

A. "I killed a man out here, plus ... it's probably late now to say that it wasn't done intentionally, but it wasn't. I know a lot of people don't see it that way, but,

ah, I was here in this Little Rock Pulaski County Jail here, and even after I was here for about seven months, I still didn't...", in other words, what I was saying I still didn't know, I was still confused about the events that happened. This is why I say, "some people didn't see it that way".

Q. And what did you mean by this, I killed a man ... it wasn't intentional, but maybe a lot of people don't see it that way.

A. My actions led up to a man being killed, is what I was saying. And when I say it wasn't done intentionally, I knew that at that point even if somehow I had have done it, it would have to have been accidental, because I, I did not get out of the car with any intention of shooting anyone.

Q. Now, if you move down the page, slightly below the middle there's a sentence that begins on the left-hand page, "I had committed"—

A. "... I can say, ah, every sin imaginable ... stealing up to adultery, fornication", there's a pause, "murder, even". Here again we're referring to the present murder verdict.

And this is all—this—I will say this, Mr. Halvonik, I think Mr. Karam knows this very well also, that this was never meant to be any kind of a confession to murder.

Q. Or to shooting Officer Vaughan?

A. Or to shooting Officer Vaughan.

This was simply meant to be a testimony to my wrong path in life and the moral responsibility that I had and all of these events that led up to this.

I think one thing if you will notice in this statement there is never any place where I do accept the jury's verdict at that time, I did accept my responsibility for a man being killed and my actions that led up to this. There is never anywhere in this transcript, or on that tape that was played today, any words that said "I shot and murdered Jerrell Vaughan."

(T. 655–57.)

With reference to his statement about the widow, Walker stated:

And I'm talking about her sense of grief that she obviously felt from what I saw when she was in the courtroom.

And to this day even, I would, I would certainly hope that Mrs. Vaughan and the other members of her family would somehow be able to forgive me for my responsibility in all that happened that night.

(T. 659.)

Walker gave the following testimony in answer to questions by the Court:

Mr. Walker, let me ask you one thing: You said, you have mentioned it several times and you considered a rather strong possibility that the firing of your gun might have been a reflex action after you were shot?

THE WITNESS: Yes, sir, that is correct.

THE COURT: All right. And that would indicate that you did get out of the car with a gun in your hands?

THE WITNESS: That is correct, I did.

THE COURT: You do recall—

THE WITNESS: Yes, sir.

THE COURT: —that you got out of the car—

THE WITNESS: I recall exactly what happened up to the point where I got shot.

THE COURT: Well, you do recall getting out of the car with the gun in your hand. Do you think that maybe as a result of getting shot that by reflex action, it's possible that you could have shot Officer Vaughan?

THE WITNESS: I have thought that that could have been possible, your Honor.

(T. 665–66.)

### THE TESTIMONY OF ROBERT MOORE

The plaintiff during the trial produced a surprise witness, Robert Moore, who claimed to have been in the Short cab and to have been a witness to the shooting of Vaughan. Moore claimed to have been at the club when Walker and Kumpe were involved in the altercation with an Airman

resulting in the shooting of the latter. (T. 354.) He claimed to have jumped into the Short cab, which was sitting in front of the club, immediately after the altercation and told the driver to take him to his home in North Little Rock (T. 382, 383.) While the cab was crossing the Broadway bridge, the dispatcher told them to follow another cab. "Well, we pulled up and there was two squad cars. One was in front of the car and one was in back, and there was another cab there and we pulled up beside the cab." (T. 355.) In the first cab were two women—one girl was Mary Roberts and he didn't know the name of the other girl. Vaughan's car was in front of the Oldsmobile and was headed back in the direction of town. (T. 391.) After they pulled up, Moore described the events as follows:

It looked just like a very simple arrest, and I just opened the back door and was standing, you know, just standing there looking, and they had their lights on and spotlights on.

And they had Mr. Kumpe, Mr. Barentine had him and he was searching him at the car. And Mr. Vaughan told Mr. Walker to get out of the car, and Mr. Walker told Mr. Vaughan, "I have a gun"—

.   .   .   .   .

—and he throwed the gun out on the ground.

.   .   .   .   .

He told him, he said, "I'm coming out" and he come out in a sitting position, you know, just like I'm sitting here, and he come out on the ground like this (Indicating), and about that time bullets just started flying.

(T. 357–58.) In answer to the question of who fired first, Moore stated, "The best I can remember the firing started over where Mr. Barentine was at." (T. 358.) Moore also testified that "when the other officers arrived, Mr. Barentine was standing there at the hood of his car and he kept saying, 'I didn't mean to, I didn't mean to.' And the other officers told him to shut up." (T. 360.) He claimed to have spoken to someone at the prosecutor's office (T. 360). He claimed that when Walker was fighting extradition, he was called to Governor Clinton's office and talked to two men on a Sunday—one was black and one white. As to why he was called, "They said that they were taking people's testimony that they hadn't talked to, and they asked me what I knew about it and I told them just exactly what I've told you all here today. And the last thing they told me was do not talk to no newspaper and do not talk to nobody." (T. 363.) On cross-examination Moore denied he had ever had mental or drinking problems (T. 367). He said that Vaughan's car was in front of the Oldsmobile and Barentine's car was in back of the Oldsmobile (T. 369). He did not contact Walker's attorney because if he had "I'd been a dead man today." (T. 379.) He did not come forward at the time of the Walker trials because "I was told by several people the best thing for me to do was to keep my mouth shut" (T. 302). He was in the VA hospital for three years (T. 398).

At the close of Moore's testimony, I informed the State that since he had only come forward the night before with his testimony, I was going to give the State several days to check into his background. In addition, his story was completely at variance with that of every other witness who had testified in this matter. After listening to him testify, I was convinced that his story was a complete fabrication. In the first place, Short, the cab driver who is now deceased, testified at the first trial (1st trial TR, 88) and in the habeas hearing (habeas TR, 282) that there were no passengers in his cab. Short was not at the club when the altercation occurred and where Moore claims he was picked up by Short. Short was at East Broadway and Vine in North Little Rock when the dispatcher ordered him to follow the Oldsmobile which was then at Third and Buckeye Streets in North Little Rock (2d trial TR, 462). Moore's story is incredible in another respect. He claimed that immediately after the altercation the Short cab drove from the club on South Main to the Broadway Bridge where Short received instructions to follow the Oldsmobile. This is a

trip of less than five minutes' duration. It is undisputed that after the altercation Walker and Kumpe went to the Travelodge Motel on Capitol Avenue in Little Rock, called Linda Ford and asked her to meet them, and then packed their belongings and checked out of the motel. They could not have been in the vicinity of a vehicle which had gone directly from the club to the Broadway Bridge. Moore's testimony that the Alderman cab arrived at the scene before the Short cab and had two female passengers is contrary to all the testimony in the case. The reason why the Short cab was directed to take up pursuit of the Oldsmobile was that the Alderman cab could not keep up. The testimony that the Vaughan car had passed the other vehicles, turned around and was in front of the Oldsmobile headed in the opposite direction is incredible, and is contrary to all other testimony in the case. Moore's testimony concerning the shooting conflicts with all other witnesses including Walker.

My conclusion that Moore's story was a complete fabrication was further confirmed when he was recalled by the State. Moore was a convicted burglar who was in the Arkansas prison system at the same time as Walker (T. 740, 750). He has been arrested innumerable times by the North Little Rock Police Department and was arrested on July 14, 1976 for terroristic threatening directed toward a member of the North Little Rock Police force (T. 769). Unquestionably, he has considerable animosity toward all police and especially the North Little Rock Police. He was caught in numerous contradictions on the stand about his police record. He denied having mental or drinking problems. (T. 367.) By agreement of counsel, I examined the records at the Veterans Administration *in camera*. One of his principal health problems has been severe and chronic alcoholism with all its associated physical and mental problems.

In regard to Moore's testimony about telling his story to two of Governor Clinton's assistants, James Smedley and Robert Lyford, the two extradition officers at the Governor's office, recalled meeting with an intoxicated man at the State Capitol (T. 728). This man discussed conditions at the prison and whether the Governor should retain an individual in the prison administration. Smedley did not recall any mention of James Dean Walker. (T. 724.) Neither did Lyford (T. 731). Lyford testified, "I remember that he appeared to be drunk while he gave us his story, but ... it just sticks out in my mind that it was a very rambling, nearly incoherent presentation." (T. 732.) Lyford said the meeting "did have something to do with corrections" (T. 731).

Gene Barentine was called for the purpose of rebutting Moore's testimony. His testimony substantially followed that given in the earlier trials of this matter although, because of the passage of time, he was hazy on some details (T. 573–616). It is not necessary to dwell on his testimony in view of my conclusion that Moore's story was completely fabricated.

### III. FINDINGS OF FACT

1. Kumpe's sworn testimony closely parallels the accounts given by the other eyewitnesses who testified in the two state court trials. There is no reason to feel that a jury would disbelieve this testimony since in all its essentials it is corroborated by the other eyewitnesses. Significantly, his testimony that he removed a gun from his waistband and placed the same under the front seat of the car is confirmed by the physical evidence at the scene. "A third gun (4-inch barrel .38 colt revolver) was found on the front floor board under the driver's (Kumpe's) seat." *Walker v. State, supra*, 388 S.W.2d at 14.

2. Kumpe denied under oath that he had fired a gun on the night in question. While there was much testimony about Kumpe's telling Walker witnesses that he had an undetected gun in his waistband, there is little or no credible testimony that Kumpe fired a gun on the night in question. His story as related by Billy Johnson, the Cummins inmate, was that the shooting broke out while Barentine was frisking

him. At no time did Kumpe tell Johnson that he had shot Vaughan or even fired a gun. Kumpe specifically denied to Mike Masterson, the *Democrat* reporter, that he had fired a shot. There was no testimony from Melody Beattie, George Bentley, Wilbur Bentley, or Warren Brooks that Kumpe ever admitted to firing a shot on the night in question. Kumpe's wife came closest to such testimony, but her testimony deserves a great deal of skepticism. She obviously has much animosity toward Kumpe. She admitted shooting Kumpe on one occasion, and Kumpe claimed she tried to kill him on another occasion. Her animosity toward Kumpe is mixed with sympathy and admiration for Walker. But even her account of Kumpe's story contains the following question and answer:

Q. Now, did he say up there in the apartment anything about firing a gun himself?

A. No, sir.

(T. 177–78.) In fact, her account of the story that Kumpe told in the Luau apartment, except for the part about secreting the gun, varies very little from the account he gave on the stand. She claimed to have chided Kumpe about telling the story in such a way that it sounded like he "did it." If she repeated his account correctly in her testimony, Kumpe made no such admission at all in the story he told in the manager's apartment. The other two parties present in the Luau apartment were not called as witnesses.

3. The most favorable testimony developed on Walker's behalf is the diary entry. Kumpe readily admitted making the entry. His explanation is that he was writing the diary under difficult physical circumstances and that he wrote "I" when he meant to write "he." This explanation, although somewhat dubious, is supported by one undeniable circumstance. The diary entry on that date, when read as a whole, is a denunciation of Walker and an expression of some fear that Walker might do him harm. The entry was written as a result of Kumpe's being asked to go speak to Walker about some trouble he was inciting among the inmates. After being rebuffed by Walker, Kumpe came back in a bitter frame of mind and wrote the entry. "Specifically, what I was referring to was that I felt very bad or I felt much remorse that Barentine didn't kill Walker when he was firing at him." (T. 41.) A fair interpretation of the whole passage is that Kumpe regrets that Walker is still around—that he didn't get killed out on the Little Rock-England road, either by him or by Barentine. If Kumpe wrote this entry exactly as intended and if it reflects the truth, this is the only admissible evidence where Kumpe said he fired a shot on the night in question. Not a single eyewitness has testified that Kumpe fired a shot. In fact, the overwhelming proof is that Kumpe was being searched when the shoot-out between Walker and Vaughan ensued.

4. Even though I do not believe that the alleged transcript of Kumpe's conversation with his deceased sister is admissible, as will be discussed *infra*, it is noteworthy that on the whole the transcript is not helpful to Walker. While Kumpe allegedly said that he shot at "the policeman," it is not clear which policeman he was talking about—Barentine or Vaughan. Later in the transcript Kumpe makes statements that strongly suggest Vaughan died as a result of the shoot-out with Walker.

5. A number of witnesses related conversations with Kumpe in which he claimed that he had a pistol secreted in his waistband, which was missed by Barentine in his search. Peggy Davidson, Billy Earl Johnson, Mike Masterson, and Melody Beattie all testified to this effect. Kumpe categorically denied making such a statement. He testified that he put the gun under the seat because he was a convicted felon and could not afford to have a firearm on his person. There are three possibilities: (1) Kumpe had the pistol in his waistband; (2) Kumpe made up the story of having a pistol in his waistband to impress his hearers that he "had put one over on the police"; or (3) Kumpe was telling the truth about not having a pistol. In my opinion, the second alternative is a real possibility. Kumpe has been in and out of prison most of his

adult life and is in prison now. It is understandable that one with his background would enjoy bragging about foiling the police. But even if Kumpe did have the pistol and Barentine missed it, this does not establish that Kumpe used it or that he used it to shoot Vaughan.

6. The testimony by Robert Moore is incredible, and I am convinced that it was completely fabricated. Moore, a prison inmate with Walker and a chronic alcoholic who had been arrested on numerous occasions by the North Little Rock Police, told a story that conflicted in every detail with all the other witnesses to this incident. He claimed to have been a passenger in the Short cab. Short, now deceased, testified under oath at Walker's trial that he did not have a passenger in his cab. Short, a disinterested witness, had no reason to lie. Moore's demeanor on the stand and the testimony which he gave, as well as my *in camera* examination of his medical records at the Veterans Administration hospital, persuade me beyond peradventure that Moore was not present at the time Vaughan was killed.

7. A man named Charles Holloway gave an affidavit which was filed with the Court of Appeals as an appendage to the Petition for a Recall of the Mandate. Holloway did not appear at the trial. I gave Walker's counsel an opportunity to present his testimony by deposition. His testimony was not forthcoming either in person or by deposition. Barentine testified that he did not know a Charles Holloway (T. 573). He never told Holloway or anyone else that he thought he had killed Vaughan (T. 574). I can only conclude that Holloway's affidavit, like Moore's story, was fabricated.

8. In May, 1964 Walker had a conversation with Jimmy Karam, a Little Rock clothier. This conversation was at the Pulaski County jail after Walker had been sentenced to death in the first trial and after he had undergone a religious conversion. Karam testified that he wanted the tape for possible use by the evangelist Billy Graham. Walker had no reason to falsify his statement on this occasion. He and Karam both admitted that the statement is a fair representation of what was said. Parts of it are set out, *supra*. It is a clear and unequivocal admission by Walker that he killed Vaughan. He made a similar admission to State Trooper Ray Carnahan.

9. In addition to the above admission out of Walker's own mouth that he killed Vaughan, there is the following testimony from Walker in answer to some questions which the Court put to him:

Mr. Walker, let me ask you one thing: You said, you have mentioned it several times and you considered a rather strong possibility that the firing of your gun might have been a reflex action after you were shot?

THE WITNESS: Yes, sir, that is correct.

THE COURT: All right. And that would indicate that you did get out of the car with a gun in your hands?

THE WITNESS: That is correct, I did.

THE COURT: You do recall—

THE WITNESS: Yes, sir.

THE COURT: —that you got out of the car—

THE WITNESS: I recall exactly what happened up to the point where I got shot.

THE COURT: Well, you do recall getting out of the car with the gun in your hand. Do you think that maybe as a result of getting shot that by reflex action, it's possible that you could have shot Officer Vaughan?

THE WITNESS: I have thought that that could have been possible, your Honor.

(T. 665–66). After an overnight recess in the hearing, Walker attempted to dilute the significance of this testimony by explaining that in the past he thought that he could have fired a shot at Vaughan. Based on his demeanor on the stand, both on the day he gave the above testimony and on the next day when he attempted to explain this testimony, his explanation did not ring true. If Walker got out of the car with a gun in his hand, it is logical that Vaughan would open fire. It is also logical that Walker would return the fire either deliber-

ately or by reflex action after Vaughan shot him. In either event, it is apparent to the Court that Walker fired the fatal bullet.

### CONCLUSIONS OF LAW

1. The Court of Appeals has directed that this Court should determine whether any of the evidence is credible enough to deserve the attention of a jury. In my opinion, the evidence which would be deserving of a new trial would be some evidence that Kumpe shot Vaughan. I find no such credible evidence in this record. I further find no credible evidence in this record that Kumpe shot *at* Vaughan. I find very little evidence worthy of belief that Kumpe fired any shot on the night in question. Kumpe has denied under oath that he did so. The only evidence to the contrary appears in a very strange and ambiguous statement in a diary being kept by Kumpe, which has been discussed in detail, *supra*. None of those present on the scene of the crime have testified that Kumpe fired a shot.

■ 2. The Court of Appeals has asked the Court to determine whether the newly discovered evidence would be admissible if a new jury trial would be held. The diary entry would be admissible. Kumpe has identified the diary and acknowledged writing the entry, and he has been given an opportunity to explain it. He has denied firing a shot on the night in question. It would be admissible under Rule 613 of the Arkansas Rules of Evidence, which is identical to Rule 613 of the Federal Rules of Evidence. However, the diary would not be substantive evidence under Arkansas Rule 801(d)(1), but could be used only for impeachment purposes. It was formerly the rule that inconsistent statements were admissible only for impeachment and not as substantive evidence. *Comer v. State*, 222 Ark. 156, 257 S.W.2d 564 (1953). That limitation has now been abolished entirely in civil cases and has been similarly abolished in criminal cases when the prior statement was given under oath and subject to the penalty of perjury. Uniform Evidence Rule 801(d)(1). Here the prior statements of Kumpe were not under oath and could only be used for impeachment in a criminal trial in Arkansas. He would have to be called and the same procedure used in the Arkansas criminal trial as was used in the hearing before me. As Judge Arnold pointed out in the concurring opinion recalling the mandate:

> Even if we assume that the hearsay could not come in as substantive evidence, however, it would probably still get before the jury in some form for purposes of impeachment. Kumpe could be called as a witness and asked whether or not he shot Vaughan. If his answer is no, he could then be asked whether he had made the alleged statements to his former wife, and whether he had made the claimed diary entry. If he admits the diary entry and the statements to his former wife, the fact of these prior inconsistent statements would then be before the jury, together with whatever explanation Kumpe might wish to offer. If, on the other hand, he denies making the alleged prior inconsistent statements, extrinsic evidence of these statements, including the diary itself and the testimony of Kumpe's former wife, could be offered for impeachments purposes. See Jones, Case Note, Roberts v. State: *A Limitation on the Impeachment of Witnesses by Extrinsic Evidence of Prior Inconsistent Statements*, 37 Ark.L.Rev. 688 (1984). In either event, the jury would know about the diary entry and the alleged oral admissions.

*Walker v. Lockhart, supra* at 1266.

Kumpe has admitted the diary entry but has given an exculpatory explanation. He has denied making the admission about which his ex-wife testified. But the diary and his ex-wife's testimony could be put before the jury for impeachment purposes only.

■ 3. I do not see how, under any circumstances, the transcript of the alleged conversation between Kumpe and his deceased sister could be admitted into evidence. It is not authenticated. McDonald

testified that it was sent to the State Police by parties unknown sometime in the last ten years. He does not know who took it or how it was taken. Even if someone were to identify the document and testify when and where it was taken, it would still be hearsay. I know of no recognized exception to the hearsay rule which would apply. The exception more nearly encompassed is Uniform Rule 803(16) which reads as follows: "Statements in a document in existence twenty [20] years or more the authenticity of which is established." This document is dated November 12, 1963, which is more than 20 years ago. However, no one has attested to its authenticity.

Petitioner argues that authentication is satisfied under Rule 901(b)(8), which provides in pertinent parts that a document is authenticated if there is:

Evidence that a document or data compilation, in any form, (A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered.

Subpart (C) above is satisfied, but the Court finds that subparts (A) and (B) prevent utilization of Rule 901(b)(8) to gain admission of this document. The manner in which this document was found creates a great deal of suspicion as to its authenticity. While this does not directly deal with the document's physical condition, it is a factor which cannot be overlooked. Furthermore, the record is lacking of any evidence which would explain where this document "would likely be" if it were in fact authentic. It is therefore impossible to state that it was found "in a place where it, if authentic, would likely be . . . ."

■ 4. Walker argues that his right to due process was violated by the suppression of exculpatory material. In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a defendant's fundamental right to a fair trial was further ensured when the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process." *Id.*, 373 U.S. at 87, 83 S.Ct. at 1196–97. Suppression is nondisclosure, *Lindhorst v. U.S.*, 658 F.2d 598, 605 n. 8 (8th Cir.1981), and it matters not whether the prosecutor acted in good faith rather than in bad faith. *Brady v. Maryland, supra,* 373 U.S. at 87, 83 S.Ct. at 1196. In *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972) the Supreme Court explained that:

The heart of the holding in Brady is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.

408 U.S. at 794–95, 92 S.Ct. at 2568. The teachings of *Moore v. Illinois, supra,* have been adhered to in this Circuit. *Evans v. Janing,* 489 F.2d 470, 474–78 (8th Cir.1973).

In *U.S. v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) the Supreme Court held that the Brady rule would also apply even where there had been no request by the defendant for exculpatory information. In reaching this holding the Supreme Court acknowledged three different situations wherein the Brady rule would apply. Where the prosecution's case included perjured testimony and the prosecutor knew or should have known of the perjury, a conviction must be set aside if there is any reasonable likelihood that the perjured testimony could have affected the judgment of the jury. *Id.,* 427 U.S. at 103, 96 S.Ct. at 2397. If a specific request was made by the defendant for the suppressed exculpatory material, a conviction must be set aside if the suppressed evidence might have affected the outcome of the trial. *Id.* at 104, 96 S.Ct. at 2397. Where either a general request or no request has been made for exculpatory material, the suppressed evidence must be evaluated in the context of the entire record and the conviction will be set aside if "the omitted evi-

dence creates a reasonable doubt that did not otherwise exist ...." *Id.* at 112, 96 S.Ct. at 2402.. *See also U.S. v. Peltier,* 731 F.2d 550, 553 (8th Cir.1984). It was the varying standard of materiality to be applied that determined which approach governed a particular case. The approach to be followed in this case will be discussed, *infra.*

The first issue that must be addressed by this court in its *Brady* analysis concerns whether or not there has been a suppression by the prosecution in this case. Again, the focus is on the nature of the evidence and not the motives of the prosecutor. In this case, there is no reason to believe that the prosecutor had any knowledge of the purported transcript of a conversation between Kumpe and his sister. Furthermore, there is no evidence that either the North Little Rock police or the Pulaski County Sheriff's Office knew of its existence. The Court has previously discussed the significant questions which exist as to who recorded, transcribed and possessed this alleged statement. Giving the petitioner the benefit of all inferences under his *Brady* claim, the Court will assume that the statement was in the possession of Paul McDonald at the time of petitioner's conviction.

There is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois, supra,* 408 U.S. at 795, 92 S.Ct. at 2568. However, the treatment of the police as an arm of the prosecution for *Brady* purposes is now generally accepted. *Walker v. Bishop, supra.* "The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if ... [a defendant] is the victim of police suppression of the material information, the state's failure is not on that account excused." *Barbee v. Warden, Maryland Penitentiary,* 331 F.2d 842 (4th Cir.1964). The fact that there are potential limits to the zone of police knowledge to be imputed to a prosecutor has been recognized, *Johnson v. Bennett,* 386 F.2d 677 (8th Cir.1967); *Hauptmann v. Wilentz,*

570 F.Supp. 351, note 42, at 389 (D.N.J. 1983), and certainly, the knowledge of all police is not imputed to a prosecutor for *Brady* purposes. Here the petitioner would have this court find that the prosecution suppressed the Kumpe-Eisner transcript by virtue of the fact that the person conducting the ballistics examination was aware of the statement's existence and failed to report the same to the defense. Although McDonald denied under oath that he knew about this statement, the Court has assumed he was aware of its existence. If he had been aware of it, it would not be surprising to find that he failed to recognize that it had some significance for petitioner's defense. The statement did not deal directly with petitioner's use of a gun at the crime scene, and this was McDonald's major assignment of inquiry from the prosecutor. It was not the function of the State Police to actively engage in the generalized investigation of such crimes. Although the temptation of hindsight may be to say that "any officer" would recognize the significance of such a statement, the Court is not so easily persuaded. Given the limited investigative assignment of McDonald, it would seem unreasonable to charge the prosecution with having suppressed material, the significance of which was lost upon someone removed from the general investigation of the crime. However, as with possession of the statement, the Court will assume that the prosecution had a duty to report the Kumpe-Eisner statement to the defense.

Since the petitioner's burden of demonstrating materiality is related to the nature of his request for *Brady* material, the Court will now turn to the determination of whether petitioner made a general or specific request for such material.

[A] request for disclosure of particular information cannot be labeled as either 'specific' or 'general' in a vacuum. Rather, the question must be asked whether, under all the circumstances presented by the case, the request was such as to give the prosecution reasonable notice of what the defense required. In other

words, 'specifity' is a function of several factors, including the literal language of the defense request itself, the apparent exculpatory character of the evidence sought, and the reasonableness of the explanation, if any, for which the evidence was not exposed or was not considered to be material by the prosecution. *Scurr v. Niccum,* 620 F.2d 186, 190 (8th Cir.1980).

The record in this case, and the petitioner does not argue otherwise, reflects only general requests for exculpatory material from the prosecutor's files. *See, e.g., Thompson v. State of Missouri,* 724 F.2d 1314, 1318 (8th Cir.1984). The Court therefore finds that petitioner's requests for *Brady* type material were general. Where a general request for *Brady* exculpatory material is involved, "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *U.S. v. Peltier,* 553 F.Supp. 890 (D.N.D.1982), *remanded for other reasons, U.S. v. Peltier,* 731 F.2d 550 (8th Cir.1984). Even if there had been a specific request, this Circuit has consistently held that where the suppressed evidence could only be used for impeachment purposes (which, assuming admissibility, is the only use to which the Kumpe-Eisner statement could be put), less materiality attaches to the evidence. *U.S. v. Librach,* 520 F.2d 550, 554 n. 3 (8th Cir.1975); *Link v. U.S.,* 352 F.2d 207, 212 (8th Cir.1965); *Lindhorst v. U.S.,* 658 F.2d 598, 606 (8th Cir.1981). Therefore, even if a specific request had been made, the burden would have been upon petitioner to have demonstrated that in the context of the entire record the omitted evidence created a reasonable doubt that did not otherwise exist. In determining whether or not petitioner has carried his burden in this regard, the Court also observes that the Kumpe-Eisner statement was surreptitiously acquired and not under oath. The only sworn statement given by Kumpe disavows any participation in the actual shooting of Officer Vaughan. This sort of consideration was taken into account by the Eighth Circuit in *Thompson v. State of Missouri, supra* at 1318–19 wherein it was noted that the party whose statement was suppressed had previously incriminated the defendant making the *Brady* argument. Similarly, Kumpe has made sworn incriminating statements against petitioner and made unsworn incriminating statements in the same document advanced by petitioner as *Brady* material.

The Court has exhaustively reviewed the entire record in this case. (See Court's discussion, *supra,* as well as the two State Supreme Court opinions and *Walker v. Bishop, supra* at 770–72; *Walker v. Bishop, supra* 1380–81; *Walker v. Lockhart, supra* at 1245–46.) In the context of the entire record, the Court concludes that the Kumpe-Eisner statement does not create a reasonable doubt concerning the guilt of petitioner in the shooting death of Officer Vaughan. Even where a review is limited to the record of Walker's second trial, the Court concludes that there is no reasonable doubt concerning his guilt created by this statement.

There is an additional reason this court would not be inclined to grant the writ based on the alleged suppression of the Kumpe-Eisner statement:

Evidence is not "suppressed" if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence. As a result the Government is not required to disclose [material] to a defendant who is "on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish." (Citations omitted.)

*U.S. v. Stewart,* 513 F.2d 957, 960 (2d Cir. 1975).

This approach has been specifically approved by this Circuit. *U.S. v. Akin,* 464 F.2d 7, 8 (8th Cir.1972). In this case petitioner was in a position to recognize that Kumpe was a witness to the shooting incident. It is unclear whether Kumpe was

interviewed by petitioner's trial attorneys. If they had, there is no reason to believe that Kumpe would have told a story any different from the one he told this court under oath. His testimony under oath incriminated petitioner and even armed with the Kumpe-Eisner statement, it is entirely possible that petitioner's attorneys would have declined to call Kumpe as a witness.

5. Petitioner continues to direct attention to the fact that he had a loaded gun in his hand immediately after the shooting accident. It must be remembered that he also had, either underneath him or right beside him a second gun that had been fired and was positively identified as the murder weapon. The differences in the police report and the testimony at trial concerning the actual location of the second gun (underneath versus right beside) is not a new development, *Walker v. Bishop, supra* at 1381. The addition of the Kumpe-Eisner statement to this record creates no reasonable doubt as to petitioner's guilt.

6. I have been directed to determine whether the new evidence, when considered against the background of the existing record, sufficiently tips the balance of the "ends of justice" standard to require that a new trial be held. My answer to this question is strongly in the negative. I believe that the evidence in the hearing before me taken as a whole confirms Walker's guilt in accordance with the two decisions of the Supreme Court of Arkansas on appeal from jury verdicts of guilt. The evidence also confirms the decision of Judge Henley in the first habeas hearing and the unanimous decision of the Court of Appeals.

7. Since much of this opinion has dealt with the issue of newly discovered evidence, the Court feels obligated to make an additional observation:

> The claim of newly discovered evidence relevant to the guilt of a state prisoner is generally not a ground for relief on federal habeas corpus. *Mastrian v. McManus*, 554 F.2d 813, 822 (8th Cir.1977), *cert. denied*, 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977). To be a basis for relief, "such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a State prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain*, 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1962).

*Drake v. Wyrick*, 640 F.2d 912, 913 (8th Cir.1981).

As in *Drake v. Wyrick, supra* at 914, "[t]he newly-discovered evidence at issue here consists of an uncorroborated assertion by a fellow inmate of the petitioner that one of the state's witnesses told him a version of the crime different from the one the state's witness offered at trial." This court cannot conclude that this newly-discovered evidence would "probably produce an acquittal on retrial," *Mastrian v. McManus*, 554 F.2d 813, 823 (8th Cir.1977), and therefore a writ of habeas corpus cannot issue on this ground.

Furthermore, Walker's attempts to gain a new trial from the state courts on the basis of newly-discovered evidence would also be unsuccessful. Newly-discovered evidence cannot form the basis of post-conviction relief, and a direct appeal on this basis would be untimely. *Chisum v. State*, 274 Ark. 332, 625 S.W.2d 448 (1981).

The Clerk is directed to forward this Memorandum Opinion to the U.S. Circuit Court of Appeals for the Eighth Circuit, sitting en banc, together with the transcript, exhibits, and additional record developed before this court pursuant to recall of mandate and remand.